Aloysius T. SUTTMANN, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 90–1138.

United States Court of Veterans Appeals.

May 18, 1993.

As Amended June 3, June 15, and June 23, 1993.

Patricia A. Suttmann, Lebanon, OH, was on the brief, for appellant.

James A. Endicott, Jr., General Counsel, David T. Landers, Acting Asst. General Counsel, Pamela L. Wood, Deputy Asst. General Counsel, and Mary Ann Flynn, Washington, DC, were on the brief, for appellee.

Before FARLEY, IVERS and STEINBERG, Associate Judges.

STEINBERG, Associate Judge:

The appellant, World War II veteran Aloysius T. Suttmann, appeals a June 13, 1990, Board of Veterans' Appeals (BVA or Board) decision denying increased ratings for his service-connected peripheral neuropathies of the right and left legs, each rated as 10% disabling. *Aloysius T. Suttmann*, BVA 90-____ (June 13, 1990). The appellant's primary contention on appeal is that the Board erred in failing to award a service-connected rating for beriberi or beriberi heart disease. The Secretary of Veterans Affairs (Secretary) seeks affirmance of the BVA decision. The Court will vacate the BVA decision and remand the case

to the Board for proceedings consistent with this opinion.

## I. Background

The veteran served in the U.S. Army from January 20, 1942, to September 3, 1946. R. at 1. He was a prisoner of war (POW) of the Japanese government from April 9, 1942, to September 8, 1945. R. at 51. His separation report states that he was wounded in action in April 1942 and that he received the Purple Heart, in addition to other decorations, but does not specify the nature of his injuries. R. at 1. There are no service medical records in the record on appeal before the Court.

In October 1946, a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) awarded the veteran a 10% service-connected disability rating for "Ulcers on left leg from shrapnel burns" and denied claims for service connection for "[r]esiduals of malnutrition, beri-beri, scurvy, pellagra, worms and [diphtheria]" because those conditions had not been found on the last examination. R. at 2. The veteran was required to waive his VA disability compensation when he entered active duty with the Ohio National Guard in June 1949. R. at 3. In February 1965, the veteran notified the RO that he had retired from the Ohio National Guard on December 31, 1961, and requested reinstatement of his service-connected disability benefits. *Ibid.* In September 1965, the RO informed the veteran by letter of its decision that his service-connected left-leg condition was not then disabling and, hence, awarded a noncompensable service-connected rating. R. at 5.

The veteran subsequently submitted to the RO a March 1974 letter from a private physician, Dr. John Worthman, who stated:

I have taken care of Mr. Suttmann since 1956. His past history prior to that time is significant in that he was in a Japanese [POW] camp in World War II and there contracted Beri–Beri and [Diphtheria].... He had an acute postero-lateral myocardial infarction in 1958 from which he made an uneventful recovery. In 1965 he was again hospitalized with chest discomfort of lesser degree. At

that time he was found to have a left bundle branch block with no evidence of any active infarction being present. He was seen in consultation and was placed on dilantin as an antiarrhythmic drug and has been on that since then. R. at 6. In a January 1975 statement, Dr. Worthman listed the veteran's disabilities as "Acute myocardial infarction[,] 1958 at age 38[;] Left bundle branch block[,] 1965", and concluded that those conditions were "probably secondary to Beri–beri in Japanese POW camp as as [sic] medical reports [none cited] to date substantiate an increased incidence of myocardial infarction at an early age in POW's who had severe nutritional and vitamin deficiencies". R. at 7.

In a September 1975 letter, the veteran requested that the RO reinstate the disability payments that he had waived upon entry into the Ohio National Guard, and asserted that his heart disability was the result of his POW incarceration. R. at 8, 10. He submitted to the RO three lay statements from persons who had served with him and had been with him in the POW camp. R. at 13–17. Those persons stated that most of the persons in the POW camp had suffered from malnutrition, starvation, beriberi, dysentery, and other conditions, and that the veteran in January 1943 had suffered a severe attack of "dry" beriberi, resulting in paralysis in his extremities, loss of most of his eyesight, and severe weight loss (to less than 100 pounds). *Ibid.* In a March 1976 letter to the veteran, the RO mischaracterized the veteran's claim as a "claim for an increase in your *service connected heart condition*" and denied that claim. R. at 18 (emphasis added). The record reveals that service connection had previously been established only for "scars, left leg, shrapnel burns and ulcers". R. at 5.

In 1981, the veteran again requested "reinstate[ment]" of his compensable service-connected disability and submitted evidence which, he stated, showed that his heart disability could have been related to his beriberi. R. at 19. In a January 1982 letter, the RO informed him that his only service-connected condition was his left-leg

condition, rated noncompensable, and that service connection for a heart condition had been denied in 1965. R. at 21. The record on appeal does not reflect any 1965 decision denying service connection for a heart disability.

On a November 1984 VA "Former POW Medical History" form the veteran described his POW experience and stated that he had been malnourished and had suffered from many diseases, including beriberi, during his captivity. R. at 22–25. He stated that he was then currently in generally good health "other than 2 heart attacks and eventual need for [a] pacemaker". R. at 25. In September 1985, pursuant to a VA POW protocol examination (a report of which is not in the record), the RO denied claims for service connection for, inter alia, beriberi and beriberi heart disease, because neither condition had been shown on the most recent examination. R. at 26–27.

In September 1988, the veteran was provided with a VA medical examination for disability evaluation. R. at 29. The report of that examination indicated that the veteran attended a VA pacemaker clinic every three months and had a monthly pacemaker checkup through a VA phone hookup, and that the veteran's "present complaint" was "[c]ontinuing hypertension" and "[n]eed to keep check on pacemaker". R. at 29. The VA report states that the examination was "limited to only peripheral neuropathy". R. at 31. The VA examining neurologist stated that the veteran had had beriberi during his POW experience, had had tingling and intense pain in his feet since that time, had lost some mobility, and had not noticed any change in motor function. R. at 32. The diagnosis was "peripheral neuropathy ... etiology [unknown], probably residual from beri-beri". *Ibid.* There is no indication that the veteran was examined for a heart condition.

In a December 19, 1988, decision, the RO awarded 10% service-connected disability ratings for peripheral neuropathy of each lower extremity, resulting in a combined 20% disability rating. R. at 38. That award was made pursuant to 38 U.S.C.A.

§ 312(b)(13) (now § 1112(b)(13)), establishing a presumption of service connection for peripheral neuropathy becoming manifest in a former POW to a degree of 10% or more at any time after service. *See also* 38 C.F.R. § 3.303(c) (1992). The RO gave the VA diagnostic code (DC) number under which the disability ratings were assigned as "8599–8621". R. at 38. That rating indicates that the RO rated the peripheral neuropathies as "unlisted conditions" requiring rating by analogy to conditions listed in VA's "Schedule for Rating Disabilities" (rating schedule) in part 4 of title 38, Code of Federal Regulations. *See* 38 C.F.R. §§ 4.20 (unlisted condition must be rated by analogy to listed disease or injury in which functions affected, anatomical localization, and symptomatology are all closely analogous), 4.27 (when an unlisted condition is encountered, RO must construct a rating code using first two digits from schedular rating of body part or system involved, and using "99" as last two digits) (1992); *Lendenmann v. Principi,* 3 Vet.App. 345, 349–51 (1992).

The first four digits of the rating code assigned by the RO—8599—indicate that the rating is for an unlisted condition affecting the peripheral nerves ("85" refers to the portion of the schedule for rating disabilities of the peripheral nerves, and "99" indicates an unlisted condition). The second four digits of that rating code—8621—refer to the DC provision for rating neuritis of the external popliteal nerve, which is the provision the RO used to assign an "analogous" rating for peripheral neuropathy. ("Neuritis" is "inflammation of a nerve", DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1127 (27th ed. 1988); the "external popliteal nerve" is a "sciatic nerve in lower part of thigh", *id.* at 1117, 1123, 1120.) Neuritis is rated as either "severe" (30% disabling), "moderate" (20%), or "mild" (10%) incomplete paralysis of that nerve. 38 C.F.R. § 4.123 (1992).

Although the RO's December 1988 decision did not specifically discuss the issues of service connection for beriberi and beriberi heart disease, the decision listed those conditions as not service connected. R. at 38. In April 1989, the veteran submitted a

Notice of Disagreement with the December 19, 1988, RO decision and stated that he was seeking a higher rating for his service-connected condition. R. at 47. In July 1989, he submitted a VA Form 1–9 (Appeal to the BVA), stating:

1.  I request extension of time (at least ninety (90) days) to gather further data on the effects beri-beri is having on the aging ex–POW. My ailment was at its severest condition while I was a prisoner of the Japanese (3½ + years). I have continuous discomfort in both feet since prison camp— to greater and lesser degrees. The condition has worsened as I have become older.

2.  Further neurological tests are to be made at Dayton, Ohio VA Hospital on July 26, 1989.

3.  My incarceration in Japanese prison camps was primarily with New Mexico National Guard personnel. I was a member of that unit. A majority of my fellow soldiers from that unit, and who still reside in New Mexico, have urged me to pursue this matter. Most are getting greater percents of disability ratings for the same problem and I would like further time to discuss this with their veterans service officers.

R. at 45.

In June 1989, the veteran was given a VA disability examination. R. at 56. No cardiovascular findings other than pulse and blood-pressure readings were made on that report and there is no indication that he was examined for heart disease. R. at 57. On the neurological portion of that examination, his peripheral neuropathy was found to be "unchanged" and his gait was normal, although he still complained of some pain and numbness in the legs. R. at 59. However, on a separate VA neurological examination at the same time, the VA examiner stated:

Pt. [(patient)] was a [POW] for 3½ years in Japan—pt. was eventually diagnosed as having beri-beri (Vit. b1) deficiency. Pt. was given yeast powder as a

treatment for this while in prison. Pt. states initially the symptoms were so bad that pt. couldn't walk. Now the symptoms are becoming almost as severe as what the original symptoms were.

R. at 64–65. The VA examiner noted that the veteran had decreased pinprick sensation in both ankles and feet compared to the rest of the leg, and that he had full motor function in "all groups"; the examiner diagnosed "peripheral neuropathy, probably secondary to residual from beriberi". R. at 66.

In the June 1990 decision here on appeal, the Board stated that the issues before it were entitlement to increased ratings for the peripheral neuropathies of each lower extremity. *Suttmann*, BVA 90-____, at 2. The Board denied ratings higher than 10% (for "mild" incomplete paralysis of external popliteal nerve) because the neurological examinations of record had indicated that the condition caused no impairment in the veteran's gait, that he had full motor strength and no atrophy, and that his only symptoms were some decreased sensation and pain and tingling. *Id.* at 4–5.

On appeal, the appellant asserts that the Board committed error by failing to award service connection for beriberi and beriberi heart disease, to provide adequate assistance in developing evidence pertinent to that claim, and to award equitable relief under 38 U.S.C.A. § 503 (West 1991). The appellant further asserts that the Board's failure to provide such assistance and award such benefits has violated his constitutional right to equal protection of the laws.

## II. Analysis

### A. Claim for Service Connection for Beriberi

*1. BVA duty to adjudicate claims "reasonably raised" to it:* The appellant asserts that the Board's failure to adjudicate the issue of his entitlement to service connection for beriberi and beriberi heart disease is error. In support of this assertion, he points to evidence which he submitted to VA and the BVA indicating that his current heart disability and his current service-connected peripheral neuropathies may

be residuals of beriberi. The Secretary asserts that the appellant had not properly raised to the RO or BVA the issue of service connection for beriberi and that the Board, therefore, properly did not adjudicate that issue.

■ Once a claimant submits a well-grounded claim for VA benefits, the Secretary is required to assist the claimant in developing the facts pertinent to that claim and, after all procurable evidence is assembled, to adjudicate the claim. *See* 38 U.S.C.A. § 5107(a) (West 1991) (duty to assist); *Gilbert v. Derwinski*, 1 Vet.App. 49, 55 (1990) (section 5107 establishes "chronological obligations" by which claimant's submission of well-grounded claim gives rise to VA's duty to assist and to adjudicate the claim under governing law and regulation). A well-grounded claim is "a plausible claim, one which is meritorious on its own or capable of substantiation." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990).

■ In determining whether a particular claim has been raised, the BVA must consider "all documents or oral testimony submitted prior to the BVA decision" and "'review all issues which are reasonably raised from a liberal reading'" of such documents and oral testimony. *EF v. Derwinski*, 1 Vet.App. 324, 326 (1991) (quoting *Myers v. Derwinski*, 1 Vet.App. 127, 129 (1991)); *see also Douglas v. Derwinski*, 2 Vet.App. 435, 438–40 (1992) (en banc). Where such review of all documents and oral testimony reasonably reveals that the claimant is seeking a particular benefit, the Board is required to adjudicate the issue of the claimant's entitlement to such a benefit or, if appropriate, to remand the issue to the RO for development and adjudication of the issue; however, the Board may not simply ignore an issue so raised. *See Douglas, supra; Fanning v. Brown,* 4 Vet.App. 225, 229 (1993); *Akles v. Derwinski*, 1 Vet.App. 118, 121 (1991); *Payne v. Derwinski*, 1 Vet.App. 85, 87 (1990); *see also Bernard v. Brown*, 4 Vet.App. 384, 392–394 (1993) (BVA required in some circumstances to remand claims reasonably raised by claimant but not decided by RO);

38 C.F.R. § 19.9 (1992) (remand for further development).

■ Applying the foregoing standards to the instant case, the Court holds, for the reasons stated below, that the Board erred in failing to adjudicate the claim, reasonably raised to it by the appellant, for entitlement to service-connected disability compensation for beriberi. Two VA neurologists in September 1988 and June 1989, respectively, had stated that the veteran's peripheral neuropathies were "probably" residuals of beriberi. R. at 32, 66. Pursuant to 38 U.S.C.A. § 1112(b)(2) (West 1991), VA is required to award service-connected disability compensation to a former POW when beriberi becomes manifest to a degree of 10% or more at any time after separation from service. *See also* 38 C.F.R. §§ 3.307(a), 3.309(c) (1992). Under VA's rating schedule, a 10% rating for beriberi requires "moderate residuals". 38 C.F.R. § 4.88a, DC 6314 (1992). Furthermore, the criteria listed in DC 6314 expressly establish that "peripheral neuropathy" is one of the symptoms upon which a disability rating for beriberi may be based. *Ibid.*

In view of the section 1112 presumption of service connection for beriberi in former POWs and the VA's own medical evidence establishing the presence of peripheral neuropathy as a "probabl[e] residual from beriberi", the Board was required to adjudicate the issue of the veteran's entitlement to service connection for beriberi. *See EF, supra; Myers, supra.* Furthermore, the veteran's request in his July 1989 VA Form 1–9 for an extension of time to "gather further data on the effects of beri-beri is having upon the aging ex–POW" clearly should have indicated to the RO and BVA that he was seeking service connection for beriberi and thus required them to adjudicate that claim. *See* 38 C.F.R. § 3.155(a) (1992) (although formal application must be filed as to every claim under 38 U.S.C.A. § 5103(a) (West 1991), "[a]ny communication or action indicating an intent to apply for one or more benefits under laws administered by [VA] ... may be considered an informal claim" requiring BVA to forward claimant a proper application if one has not already been sent); *Hamilton v. Brown,* 4 Vet.App. 528, 544 (1993) (en banc) (VA's failure to forward application form to claimant who had raised informal claim will waive requirement of filing formal application); *Servello v. Derwinski,* 3 Vet.App. 196, 200 (1992) (same).

■ **2. Reasons or bases for BVA's selection of proper DC provision:** There is another, equally compelling, basis for the Court's holding that the Board was required to adjudicate a claim for service connection for beriberi. Pursuant to 38 U.S.C.A. § 7104(d)(1) (West 1991), the Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Masors v. Derwinski,* 2 Vet.App. 181, 188 (1992); *Hatlestad v. Derwinski,* 1 Vet.App. 164, 169 (1991); *Gilbert,* 1 Vet.App. at 57. When, on the basis of the evidence of record, two or more provisions of VA's rating schedule are potentially applicable to the evaluation of a particular disability, the Board must provide reasons or bases for its decision to rate that disability under one such provision rather than another potentially applicable provision. *See Lendenmann,* 3 Vet.App. at 349–50; *Pernorio v. Derwinski,* 2 Vet.App. 625, 629 (1992).

■ In the instant case, the September 1988 VA examination upon which the RO in December 1988 based its award of service connection yielded a diagnosis of "peripheral neuropathy ... etiology [unknown], probably residual from beri-beri". R. at 32. As noted above, the RO, pursuant to that examination, awarded the veteran service connection for "peripheral neuropathy" and assigned an "analogous rating" for that condition under 38 C.F.R. § 4.20. However, the rating schedule provides a specific listed rating for beriberi, and provides that such a rating may be assigned based on residuals including peripheral neuropathy. *See* 38 C.F.R. § 4.88a, DC

6314. Therefore, on the basis of the September 1988 and June 1989 VA examinations diagnosing peripheral neuropathy as a probable residual from beriberi, the rating-schedule provision for beriberi clearly was potentially applicable to the evaluation of the veteran's disability, and the Board was required to consider and discuss whether the veteran's service-connected disability should have been rated under that provision.

That requirement is heightened where, as here, the RO and Board have rated the veteran's disability as an "unlisted" condition and assigned a rating by analogy to other conditions. *See Lendenmann, supra; Pernorio, supra.* The regulations provide that "[n]o other numbers than these listed or hereafter furnished [in the rating schedule] are to be employed for rating purposes, with an exception as described in this section, as to unlisted conditions." 38 C.F.R. § 4.27 (1992). An analogous rating thus may be assigned only where the service-connected condition is "unlisted". Therefore, where, as here, the evidence indicates that the service-connected condition may be ratable as a specific listed condition, it is manifest that, under section 7104(d)(1), the Board must explain why the rating-schedule provision for that listed condition is not applicable prior to assigning an analogous rating. The Board's failure to consider and discuss the veteran's entitlement to a rating under the schedular provision for rating beriberi is a further reason why the matter must be remanded for readjudication.

■ *3. Beriberi heart disease:* In claiming entitlement to service connection for beriberi, the appellant asserts that the Board was required to consider the evidence that he suffers from beriberi heart disease and to assign a disability evaluation which takes into account his disability due to his heart condition. The Court agrees on the first contention, for several reasons. First, the veteran was diagnosed in 1958 with acute myocardial infarction and in 1965 with left bundle branch block, both of which were "probably secondary to Beriberi" in the opinion of his private treating

physician. R. at 7. Furthermore, the evidence also indicates that he currently suffers from cardiac disability requiring the use of a pacemaker. R. at 25, 29. Indeed, the governing statutory and regulatory provisions provide that service connection will be awarded for "beriberi *(including beriberi heart disease)*" becoming manifest in a former POW to a degree of 10% or more at any time after separation from service. 38 U.S.C.A. § 1112(b)(2) (West 1991) (emphasis added); *see also* 38 C.F.R. § 3.309(c) (1992). Because the Board was obliged to adjudicate the issue of the veteran's entitlement to service connection for beriberi, it was also required to consider and discuss the evidence that he had suffered a cardiac condition as the result of beriberi, and to explain the significance of that evidence in demonstrating entitlement to service connection for beriberi. *See Gilbert,* 1 Vet.App. at 59 (BVA required to provide "analysis of the credibility or probative value of the evidence submitted by or on behalf of the veteran").

Under the rating-schedule provision for beriberi, a disability rating for beriberi may be based on "history of limited nourishment, edema, weakness, cardiac enlargement or murmurs, peripheral neuropathy or other manifestations". 38 C.F.R. § 4.88a, DC 6314 (1992). Therefore, if, on remand, the Board awards service connection for beriberi, it must consider and discuss whether the veteran's heart disability is related to his beriberi. If it so decides, then any disability rating for beriberi must take into account the veteran's disability due to his heart disease. Alternatively, if appropriate, the Board may assign a rating for the veteran's heart disability as a "secondary condition" under 38 C.F.R. § 3.310(a) (1992).

### B. Threshold Standard for POW Presumption Claims

Although the veteran's claims for service connection for beriberi and beriberi heart disease were previously and finally denied by unappealed RO decisions in October 1946 and September 1985 (R. at 2, 26–27), the veteran was not required to submit "new and material evidence" in order to

give rise to a duty on the part of the RO and BVA to adjudicate those claims. 38 U.S.C.A. § 5108 (West 1991). Rather, for the reasons stated in part B.2., below, the Court holds that he was required only to submit a well-grounded claim for service connection.

*1. Reopening claims previously denied by RO:* Pursuant to 38 U.S.C.A. § 7105(c) (West 1991), when a claim is denied by an RO decision and the claimant fails to file a timely appeal, that decision becomes final and the claim may not thereafter be reopened or allowed "except as may otherwise be provided by regulations not inconsistent with" title 38, U.S.Code. *See also* 38 U.S.C.A. § 7104(b) (West 1991) (establishing finality of claims denied by BVA decision). We conclude, for the reasons set forth below, that this finality rule is subject to the exception in 38 U.S.C.A. § 5108 (West 1991) that requires the Secretary to reopen and readjudicate a claim when "new and material evidence" is presented or secured with respect to that claim. *Cf. Jones (McArthur) v. Derwinski,* 1 Vet.App. 210, 215 (1991) (section 5108 as exception to section 7104(b)); *Manio v. Derwinski,* 1 Vet.App. 140, 145 (1991) (same).

In *Manio, Jones,* and many subsequent cases, the Court has applied the section 5108 provision for reopening upon new and material evidence as an exception to the finality of prior BVA decisions under 38 U.S.C.A. § 7104(b) (West 1991). That result clearly follows from the text of section 7104(b), which expressly provides that BVA decisions will be final "[e]xcept as provided in section 5108". Although the Court has also applied section 5108 as an exception to the finality of prior unappealed RO decisions under section 7105(c), *see Sweat v. Principi,* 4 Vet.App. 67, 70–71 (1993), it has not previously articulated the basis for that application. In view of the fact that section 7105(c) does not expressly refer to section 5108 as an exception to the finality of unappealed RO decisions, we articulate that basis here.

Section 7105(c) appears on its face to permit reopening of claims finally denied by an RO and not timely appealed *only* in circumstances specified in *regulations* promulgated by the Secretary that are "not inconsistent with" title 38 of the U.S.Code. However, section 7105(c) cannot properly be read, in isolation from 38 U.S.C.A. § 5108 (West 1991). *See Talley v. Derwinski,* 2 Vet.App. 282, 286 (1992) (" '[e]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole' " (quoting 2A NORMAN J. SINGER, SUTHERLAND STAT. CONST. § 46.05 (4th ed. 1984); *id.* (5th ed. 1992)).

Section 5108 is mandatory; it *requires* "the Secretary" (not just the BVA) to reopen "a claim which has been [finally] disallowed" (not just a claim which has been finally disallowed *by the BVA)* when new and material evidence is presented or secured with respect to that claim. Construing sections 5108 and 7105(c) so as to harmonize them requires that section 7105(c) be read as providing by implication that, at a minimum, a claim denied by a final RO decision must be reopened when new and material evidence is presented under section 5108 (along the lines of the explicit exception in section 7104(b) as to reopening prior, final *BVA* decisions). Such a reading is reinforced by the fact that section 7105(c) authorizes exceptions "not inconsistent with" statutory provisions in title 38, U.S.Code; hence, to construe section 7105(c) in any other way would be "inconsistent with" section 5108. The Secretary also has broad authority, under 38 U.S.C.A. § 501(a) (West 1991), "to prescribe all rules and regulations which are *necessary* or appropriate to carry out laws administered by the Department and are consistent with those laws." (Emphasis added.)

The Secretary's current regulations are, at best, ambiguous as to whether they authorize reopening, upon new and material evidence, of a claim previously and finally denied by an unappealed *RO* decision. The Secretary has prescribed standards for adjudicating requests to reopen a claim after "an *appellate* decision". 38 C.F.R. § 20.1103 (1992) (emphasis added). In 38 C.F.R. § 3.160(e) (1992), however, the Secretary

has also defined a "[r]eopened claim" as "[a]ny application for a benefit received after final disallowance of an earlier claim", and done so without reference to whether such final disallowance was by a BVA "appellate decision" or a final unappealed RO decision. Other regulations dealing with reopened claims and "new and material evidence" do not address whether a claim previously and finally denied by a final unappealed RO decision may be reopened upon new and material evidence. See 38 C.F.R. §§ 3.156, 3.400(q) (1992). To the extent that there may seem to be a technical conflict between the provisions, a "necessary" regulation, pursuant to 38 U.S.C.A. §§ 501(a) and 7105(c), giving full effect to the statutory title 38 scheme, would resolve it.

■ **2. Claims as to which section 5108 does not apply:** However, the above finality provisions apply only where a claimant presents the same claim which was previously denied and, of necessity, seeks to establish the same facts which were the subject of the prior final denial. Where a claimant's entitlement to the benefits sought may be predicated upon the incurrence or increase in severity of a disability or disabilities occurring after the prior final denial, the new claim is not the same claim as the previously and finally denied claim; it is necessarily a different claim based, at least in part, upon different facts. The Court has thus held that a repeat claim for an increased rating for a service-connected disability, where a similar claim has been previously and finally denied, is not a claim to reopen subject to the new-and-material-evidence requirement, because the claimant's entitlement to benefits could be predicated on a finding that the service-connected disability had increased *since* the prior final denial and, hence, the claim was based upon facts different from the prior final claim. *Proscelle v. Derwinski*, 2 Vet.App. 629, 631 (1992). For the same reasons, the Court has held that a repeat claim for VA non-service-connected disability pension based on "permanent and total disability", where a similar claim has previously been denied, is not a claim to reopen, because permanent

and total disability could be established on the basis of facts occurring *since* the prior final denial. *Abernathy v. Principi*, 3 Vet. App. 461, 464 (1992). In *Abernathy*, the Court noted that claims for pension based on permanent and total disability differed from claims for service connection, in that the former claims were based upon facts which may have changed since the prior final decision—specifically, the veteran's current physical or mental condition—whereas the latter were based upon facts that were "essentially static in nature", such as when the veteran's disability was initially incurred. *Ibid.*

■ With respect to claims for a total disability rating based on individual unemployability due to service-connected conditions (TDIU rating), the Court has not expressly held that such a claim, where a similar claim has been previously and finally denied, is not subject to the new-and-material-evidence requirement. In *Fluharty v. Derwinski*, 2 Vet.App. 409, 411 (1992), which predated *Proscelle* and *Abernathy*, the Court applied the section 5108 new-and-material-evidence requirement to a claim for a TDIU rating and held that it had been satisfied as to that claim, where a similar claim had been previously and finally denied. In *Fluharty*, the Court's determination that the evidence was new and material subsumed a determination that the veteran had submitted "evidence sufficient to justify a belief in a fair and impartial individual that the claim [was] well grounded." 38 U.S.C.A. § 5107(a) (West 1991). Upon similar facts in *Martin v. Brown*, 4 Vet. App. 136, 139 (1993), which postdated *Proscelle* and *Abernathy*, the Court did not apply the section 5108 new-and-material-evidence requirement to a claim for a TDIU rating. A claim for a TDIU rating, where service connection has previously been established for the underlying condition or conditions, shares the essential characteristics of a claim for an increased service-connected rating and a claim for a non-service-connected pension. Entitlement to a TDIU rating may be based upon a finding that the claimant has become unemployable, due to service-connected disabilities,

*since* the prior final denial. Therefore, it follows from the analyses in *Proscelle, Abernathy,* and *Martin* that a repeat claim for a TDIU rating, where a similar claim has been previously and finally denied, should be viewed as a new claim, subject to the requirement that it be well grounded and not the requirement that there be new and material evidence. *Cf. McGinnis v. Brown,* 4 Vet.App. 239, 244 (1993) (prior cases do not "set the limit on the" analysis and "reasoning . . . to be used in resolving . . . similar cases").

■ The Court now holds that the same analysis for well-grounded claims applies to claims for service connection for the POW presumptive diseases listed in 38 U.S.C.A. § 1112(b) and 38 C.F.R. § 3.309(c). Although the Court in *Abernathy* noted that claims for service connection are generally subject to the finality provisions of sections 7104(b) and 7105(c) and the new-and-material-evidence requirement of section 5108 because such claims are generally based on facts that are "essentially static in nature" regarding the time of onset of the veteran's condition, that general truism does not apply to the POW presumptive diseases. Section 1112(b) provides that service-connected disability compensation will be awarded for any listed POW presumptive disease becoming manifest to a degree of 10% or more in a former POW **at any time after separation from service.** *See also* Veterans' Radiation Exposure Amendments of 1992, Pub.L. No. 102–578, § 2(a)(3), 106 Stat. 4774 (amending 38 U.S.C.A. § 1112(c) (West 1991) to provide presumption of service connection for 15 listed conditions manifesting at any time in a radiation-exposed veteran). Therefore, unlike most service-connection claims, which are predicated upon a finding that the claimed condition was incurred during service or, under an applicable presumption period, within a short time thereafter, entitlement to service connection for a POW presumptive disease may be established upon a showing that the former POW claimant **currently** suffers from a POW presumptive condition to a degree of 10% or more. As with TDIU claims and claims for increased ratings or non-service-con-

nected pension, a claim for service connection for a POW presumptive condition may be based upon facts occurring since any prior final denial of that claim.

■ Based upon the foregoing analysis, the Court holds that the veteran's claim for service connection for beriberi, including beriberi heart disease, is a new claim and is not subject to the requirement that there be new and material evidence to reopen it. The veteran, therefore, was required, as a threshold matter, only to submit a well-grounded claim for service connection. *See* 38 U.S.C.A. § 5107(a); *Murphy,* 1 Vet.App. at 81 (well-grounded claim is a "plausible claim, one which is meritorious on its own or capable of substantiation"). Because the evidence in this case includes two VA neurologists' diagnoses of peripheral neuropathy as a "probabl[e] residual" of beriberi, and because, as stated above, a compensable rating for beriberi may be predicated upon the presence of residuals including peripheral neuropathy, the Court holds that the veteran's claim for service connection for beriberi, including beriberi heart disease, is plausible and, hence, well grounded. *Cf. Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993) (well-groundedness is a question of law; Court holds claim not well grounded because claimant had not submitted any competent evidence establishing a "plausible" claim of service connection).

### C. Duty to Assist

■ Once a claimant has submitted a well-grounded claim for benefits, the Secretary is obligated to assist the claimant "in developing the facts pertinent to the claim." 38 U.S.C.A. § 5107(a) (West 1991); *see Murphy,* 1 Vet.App. at 81–82. That duty includes seeking to obtain all pertinent medical records of which VA has been put on notice and, where necessary for proper adjudication of the claim, providing a medical examination. *See Murincsak v. Derwinski,* 2 Vet.App. 363, 369–73 (1992); *EF,* 1 Vet.App. at 326; *Littke v. Derwinski,* 1 Vet.App. 90, 91–92 (1990).

In the instant case, the record, as constituted before the Court, does not provide an adequate basis for adjudicating the veteran's claim for service connection for beriberi, including beriberi heart disease. The most recent VA medical examinations in September 1988 and June 1989 contain no indication that the veteran was examined for cardiovascular disabilities or any possible residuals of beriberi other than peripheral neuropathy. R. at 29–32, 56–66. The September 1985 RO decision refers to a VA POW protocol examination (R. at 26), but the record does not contain copies of any such VA examination, as it should have if such records exist. There is no evidence in the record that VA has ever provided the veteran with an examination with respect to his well-grounded claim for service connection for beriberi or cardiovascular disability. Therefore, the Court holds that "fulfillment of the statutory duty to assist here includes the conduct of a thorough and contemporaneous medical examination, one which takes into account the records of prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one." *Green (Victor) v. Derwinski*, 1 Vet.App. 121, 124 (1991); *see also Wilson v. Derwinski*, 2 Vet.App. 16, 21 (1991); *Moore v. Derwinski*, 1 Vet.App. 401, 405 (1991); *EF, supra.* Additionally, on remand the Board must seek to obtain copies of any pertinent VA medical records and any other documents that are indicated by the evidence before it. *See Murincsak, supra; Masors*, 2 Vet.App. at 186–87. In this regard, because there is no explanation in the record for the absence of the veteran's service medical records, the Board should seek to obtain those records or explain why they cannot be obtained.

In developing and adjudicating the claim for service connection for beriberi and beriberi heart disease, the Board must ensure compliance with VA's rules for adjudication of POW claims. *See* Department of Veterans Affairs Adjudication Procedure Manual, M21–1, Part III, para. 4.16 (requests for POW records); *id.*, Part III, para. 5.12 (standards for development and adjudication of POW claims); Veterans Benefits Administration Circular 21–91–2 (Jan. 15, 1991) (same); *see also Hamilton v. Derwinski*, 2 Vet.App. 671, 675 (1992) (VA "[s]ubstantive rules, those which have the force of law and narrowly limit administrative action, in the VA Adjudication Procedure Manual are the equivalent of Department regulations"); *Fugere v. Derwinski*, 1 Vet.App. 103, 107 (1990) (same). Once the evidence has been properly developed, the Board is to adjudicate the claim in light of all applicable law and regulation and issue a decision fully supported by an adequate statement of reasons or bases under 38 U.S.C.A. § 7104(d)(1) that includes "an analysis of the credibility and probative value of the evidence submitted by and on behalf of the veteran" and that is sufficient to enable the appellant and this Court to understand the "precise basis" for the Board's decision. *Gilbert*, 1 Vet.App. at 59.

### D. Equitable Relief

The appellant asserts that he is entitled to equitable relief under 38 U.S.C.A. § 503 because the prior denials of his claim have been based on "administrative error", that is, VA's failure to provide him with a proper medical examination for beriberi. Section 503(a) gives the Secretary authority to provide equitable relief when he determines that VA benefits have not been provided by reason of administrative error on the part of the Federal Government or any of its employees. In *Darrow v. Derwinski*, 2 Vet.App. 303, 306 (1992), this Court held that authority to award equitable relief under section 503(a) is committed "to the sole discretion of the Secretary" and that the BVA and, consequently, this Court are without jurisdiction to review the Secretary's exercise of that discretion. Therefore, the Court may not review the merits of the appellant's contention of entitlement to equitable relief under section 503(a), and the appeal as to that matter is dismissed for lack of jurisdiction in the Court.

### E. Constitutional Claims

The veteran further asserts that VA has violated his rights to equal protection of the laws under the U.S. Constitution

(as the principles of the Fourteenth Amendment are applied to the Federal Government through the Fifth Amendment Due Process Clause, *see Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Saunders v. Brown,* 4 Vet.App. 320, 325 (1993)) by failing, without a rational basis for such disparate treatment, to provide him with the same evaluation and treatment provided to other similarly situated veterans seeking to establish service connection for beriberi. He asserts that veterans in New Mexico have received better diagnostic evaluation and treatment for beriberi than he has received at VA facilities in Ohio. Although the veteran had asserted to VA in his VA Form 1–9 that veterans in New Mexico were "getting greater percents of disability ratings for the same problem" (R. at 45), he did not raise to VA or BVA a constitutional claim and, therefore, there has been no evidentiary development of the veteran's equal-protection claim; nor have the veteran's factual or legal assertions as to that claim been adjudicated.

Since the claim was not before the RO or the BVA it "is not properly before the Court", *Branham v. Derwinski,* 1 Vet. App. 93, 94 (1990) and the Court will not adjudicate it. As this Court recently stated:

> Although courts generally will not require the exhaustion of administrative remedies where the administrative agency's inability to grant the relief requested renders such exhaustion futile, *Asociacion Colombiana de Exportadores de Flores v. United States,* 916 F.2d 1571, 1575 (Fed.Cir.1990), the need for factual development to help the court resolve the constitutional issue is a proper reason for requiring exhaustion of remedies before judicial review of [a constitutional claim]. *W.E.B. DuBois Clubs of America v. Clark,* 389 U.S. 309, 312, [88 S.Ct. 450, 452, 19 L.Ed.2d 546] (1967).

*Saunders,* 4 Vet.App. at 326 (1993). Because review in this Court is limited to "the record of proceedings before the Secretary and the Board", 38 U.S.C.A. § 7252(b) (West 1991), the development of facts pertinent to a constitutional claim must take place before the Department and, hence, such claims generally must be raised, in the first instance, before the RO or the Board.

If, while the case is on remand before the Board (or the RO), the appellant wishes to raise his constitutional claim of disparate treatment of similarly situated veterans at VA facilities, he will be permitted to submit evidence and argument in support of this claim. If the claim is raised to the Board on readjudication of the veteran's claim for service connection for beriberi, the Board is free to express an opinion on the appellant's constitutional claim. *See Saunders,* 4 Vet.App. at 326 (" '[a]dministrative agencies are entitled to pass on constitutional claims but they are not required to do so' ") (quoting *Plaquemines Port v. Federal Maritime Comm'n,* 838 F.2d 536, 544 (D.C.Cir.1988)).

### III. Conclusion

For the reasons stated in the foregoing opinion, the June 1990 BVA decision is vacated and the matter is remanded to the Board for prompt further development and adjudication consistent with this opinion. *See Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991). "On remand, the appellant will be free to submit additional evidence and argument on the question[s] at issue". *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). As to the claim for equitable relief under 38 U.S.C.A. § 503, the appeal is dismissed.

VACATED AND REMANDED; APPEAL DISMISSED IN PART.