Eddie W. VERDON, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 94–0186.

United States Court of Veterans Appeals.

Feb. 7, 1996.

Jeffrey Wood was on the brief for the appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and Adam K. Llewellyn were on the brief, Washington, DC, for the appellee.

Sean Kendall was on the brief, Washington, DC, for the National Organization of Veterans Advocates as amicus curiae.

Before NEBEKER, Chief Judge, and HOLDAWAY and STEINBERG, Judges.

STEINBERG, Judge, filed the opinion of the Court. HOLDAWAY, Judge, filed an opinion concurring in part and dissenting in part.

STEINBERG, Judge:

The appellant, Eddie Verdon, appeals a February 7, 1994, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to service connection for residuals of a bunionectomy of the right foot. Record (R.) at 10. Both parties filed briefs and supplementary memoranda, and the amicus curiae filed a brief in response to an April 4, 1995, order of the Court. For the reasons that follow, the Court will vacate the BVA decision and remand two matters.

## I. Background

The veteran served on active duty in the U.S. Navy from November 1985 to March 1988. R. at 18. An August 1985 induction medical examination report noted bilateral valgus and an orthopedic examination was requested for "[b]unions on big toes". R. at 61–63. An August 1985 Navy orthopedic consultation report diagnosed bunions and "Hallux Valgus" and noted "no problem [with] feet". R. at 63. ("Hallux valgus" is angulation of the great toe away from the midline of the body (toward the other toes) and can be caused by bunions, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 244, 729 (27th ed.1988) [hereinafter DORLAND'S].) Service medical records (SMRs) recorded that the veteran had suffered an injury to the right knee on October 19, 1986, and had been placed on limited duty. R. at 20–22. A January 1987 SMR indicated that the veter-

an had "[b]listers" and "[b]unions [on] both big toes" and stated: "For years had problems [with] them". R. at 64. He underwent arthroscopy at a Navy hospital in April 1987 for a right-knee injury. R. at 25–26. In October 1987, he had a bunionectomy "for hallux valgus" of the right great toe. R. at 66–68. He was discharged in February 1988 as "unfit because of physical disability". R. at 44. His right-knee condition was listed as the condition that caused his unfitness, and "s[tatus] p[ost] bunionectomy" was listed as a condition that was "not separately unfitting and [did] not contribute to the unfitting conditions". *Ibid.*

The veteran filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) an April 21, 1988, application for VA compensation or pension for his right-knee condition, a cut to his right ear, and a bunionectomy. R. at 50–51. In June 1988, a VA medical examination report listed an impression of "[r]esidual bunion surgery, right foot", and noted "[n]o specific orthopedic surgical treatment indicated at this time." R. at 86. A July 1988 VA orthopedic examination report listed diagnoses of the following: (1) "Insufficiency, r[ight] ant[erior] cruciate ligament, s[tatus] p[ost] repair"; (2) "[b]union deformity r[ight] foot, s[tatus] p[ost] repair"; and (3) "[l]aceration, r[ight] ear lobe, s[tatus] p[ost] repair". R. at 59. A December 15, 1988, VARO decision awarded service connection for a right-knee injury, rated 20% disabling, and a left-ear scar, rated 0% disabling. R. at 81. The RO decision denied service connection for a right-foot bunionectomy because "[b]unions existed prior to service and the bunionectomy in 1987 is considered to have been remedial surgery, to correct the pre-existing defect." R. at 80–81.

In January 1989, a VA medical examination report noted that the veteran's fourth and fifth toes on the right foot were "discolored and swollen" and that he had stated that he had injured his right foot two days previously. R. at 91–92. A contemporaneous x-ray report noted "[o]ld healed march fractures of the shafts of the right 2nd and 3rd m[eta]t[arsals]." R. at 93. (A "march fracture" is a fracture of a bone of the lower extremity, developing after repeated stresses, as seen in soldiers, DORLAND'S at 661.)

In September 1989, the veteran filed with the RO an application for increased ratings for his service-connected right-knee and right-ear conditions and for service connection for his right-foot condition. R. at 83 (*see* R. at 104). In November and December 1989, the RO confirmed its December 1988 decision, stated that a December 1988 letter it had sent the veteran had not fully informed him as to the December 1988 decision, and advised him that he could reopen his claim for service connection with new evidence. R. at 95–96. A December 1989 VA outpatient report noted that the veteran had injured his left leg in a "martial arts contest". R. at 120. The veteran filed a December 26, 1989, Notice of Disagreement (NOD) and a February 1990 VA Form 1–9 (Substantive Appeal to the BVA) [hereinafter 1–9 Appeal]. R. at 99, 109; *see* R. at 104.

A July 30, 1990, VA orthopedic outpatient clinic report listed an impression of "[l]igament instability, right knee", and recommended referral to the state department of rehabilitation because "it appears that he will not be able to continue at his present work . . . which requires walking." R. at 122. In September 1990, a VA medical examination report noted limited flexion of the right knee and a tender scar on the right ear, but did not mention any right-foot problem. R. at 115–16. A February 1991 RO decision concluded: "No change is warranted." R. at 119. In January 1992, the BVA remanded the claim to the RO to determine if the veteran wished to have a hearing. R. at 135.

At a January 6, 1993, RO hearing, the veteran testified under oath that he was currently working and that he did not "lose any time" from work due to his knee condition, but that it did "interfere[ ]" with his "work performance". R. at 152, 161–62. As to his right foot, he testified that he had had asymptomatic bunions when he entered service, and that they had been aggravated by the hard plastic shoes he had worn in service. R. at 163–64, 171. He also testified, on the one hand, that he currently had pain "[r]ight on the side of the foot" with limited movement in the right great toe and numbness

and tingling on the top of his foot, as well as pain due to the remaining bunion on his left foot. R. at 168–70. On the other hand, when asked if the bunionectomy had improved his right-foot condition, he testified: "It turned out to be, okay, it doesn't hurt on the side of the foot where the bunion was". R. at 170.

In a February 1993 decision, the hearing officer, inter alia, affirmed the RO's previous denial of service connection for the right-foot condition. The hearing officer's decision noted that pre–1989 SMRs and VA medical records were negative for limitation of motion and numbness of the right great toe; that the veteran had injured his right foot in January 1989; and that an x-ray at that time had revealed old march fractures of the second and third metatarsals. R. at 177. A March 1993 RO decision rated the right-ear scar as 10% disabling, continued the 20% rating for the right-knee disability, and continued the denial of service connection for residuals of a right-foot bunionectomy. R. at 186–87.

In a May 1993 letter to service representative Charles Moran of the Veterans of Foreign Wars (VFW), the veteran stated: "I have come to an agreement with the terms on the 10% for the ear[,] and for my leg I agree at 20% at this time"; he voiced a wish to appeal the denial of service connection for residuals of the right-foot bunionectomy. R. at 191. (VA received a copy of this letter in some manner. See R. at 6.) Mr. Moran's June 1993 written presentation to the BVA listed the "issue" as "service connection for residuals of bunionectomy". R. at 194. On the other hand, a July 1993 written presentation to the Board by VFW service representative Jesse Boone argued for an increased rating for the right knee as well as service connection for residuals of the bunionectomy. R. at 196–97. Furthermore, the representative stated: "This case was initially reviewed by this service in an informal hearing presentation dated November 12, 1991, *now reoffered.*" R. at 196 (emphasis added). That November 12, 1991, VFW written presentation had listed "Entitlement to an increased evaluation for service-connected right knee condition" as one of three questions at issue, and then stated:

> The veteran's first contention is that his service-connected right knee condition is of such severity as to warrant an increased evaluation. VA examination of June 1, 1988, notes right knee has full extension. Flexion was noted to be lacking 15 degrees. Final impression was ligament instability with traumatic arthritis. In this regard, we would ask the Board to consider the provisions of 38 C.F.R. § 4.7 in their deliberations, and grant the next higher evaluation under Diagnostic Code 5257.

R. at 130–31.

The February 1994 BVA decision here on appeal denied service connection for residuals of a right-foot bunionectomy, finding that the veteran had experienced problems, including pain, with bunions before service; that the bunion surgery in service was remedial; and that his right foot had improved by the time he left service. R. at 8, 10. The Board cited 38 U.S.C. § 1131 and 38 C.F.R. § 3.306(a) as to aggravation of preexisting injuries, and 38 C.F.R. § 3.306(b)(1) as to ameliorative surgical or medical treatment in service. R. at 9. The Board concluded:

> As it stands, evidence of an increase in underlying pathology in service is absent. On the contrary, the record indicates that the remedial measure undertaken, surgical correction of the bunion deformity, was successful. At his recent hearing, the veteran reported that he did not experience pain on the side of the right foot where the bunion had been.

R. at 10. The BVA found that "in a statement received from the veteran in May 1993, he made clear his intent to pursue on appeal only the issue of entitlement to service connection for residuals of a right foot bunionectomy." R. at 6. The Board thus did not address the issue of an increased rating for the right knee. A timely appeal to this Court followed.

## II. Analysis

### A. Increased Rating for Right–Knee Disability

■ A claim for an increased rating is a new claim, not subject to the provisions of 38

U.S.C. § 7104(b) prohibiting reopening of previously disallowed claims except upon new and material evidence. *See Proscelle v. Derwinski,* 2 Vet.App. 629, 631–32 (1992); *see also Suttmann v. Brown,* 5 Vet.App. 127, 136 (1993). A claim for an increased rating is generally well grounded when an appellant indicates that he has suffered an increase in disability. *Ibid.* The veteran argues, through counsel, that the BVA erred in determining that he had abandoned his claim for an increased rating for his service-connected right-knee disability. Brief (Br.) at 4. He asserts that his May 1993 letter to his service representative, stating "for my leg I agree at 20% at this time", was ambiguous, and that his service representative had argued both issues in a July 1993 written presentation to the Board. Br. at 3.

There is no statute or regulation that expressly applies to withdrawal of a separate claim within an appeal. However, 38 C.F.R. § 20.204(c) provides as to withdrawal of an NOD or a 1–9 Appeal:

Withdrawal may be by the appellant or by his or her authorized representative, except that a representative may not withdraw either [an NOD] or [1–9 Appeal] filed by the appellant personally without the express written consent of the appellant.

38 C.F.R. § 20.204(c); *see Hamilton v. Brown,* 4 Vet.App. 528, 538 (1993) (en banc), *aff'd,* 39 F.3d 1574 (1994). The issue of withdrawal of a separate claim (covered by a multiple-claim single NOD) is analogous to withdrawal of an NOD or a 1–9 Appeal, and the Court will therefore apply § 20.204(c) by analogy to the situation in the instant case.

The veteran's May 1993 letter was addressed to his VFW service representative and not to the RO or BVA. R. at 191. It was similar to an attorney-client communication. The veteran himself apparently did not notify VA or the BVA that he was withdrawing that claim. (The record does not reveal how a copy of the May 1993 letter got to the Board.) In his June 1993 written presentation to the BVA, Mr. Moran discussed only the issue of service connection for bunionectomy residuals but did not expressly withdraw the issue of an increased rating for the right knee. R. at 194. In his July 1993

written presentation to the BVA, Mr. Boone, the other VFW representative, expressly stated that the questions both of service connection for bunionectomy residuals and of an increased rating for the right-knee disability were at issue, and incorporated by reference and reoffered the November 1991 statement expressly arguing both issues. R. at 196–97; *see also* R. at 130–31. Thus, of the two post–May–1993 statements submitted to VA by the veteran's representative, the VFW, one did not mention the issue of an increased rating for the right knee, and the other expressly included that issue. Neither the veteran nor his representative expressly notified VA in writing that the right-knee claim was abandoned, although the veteran's May 1993 letter to his representative certainly suggested that intention.

■ In considering the question of abandonment of that claim, we must take into consideration "the nonadversarial setting of the [VA] claims adjudication process", *Isenbart v. Brown,* 7 Vet.App. 537, 541 (1995), in which VA is required to construe liberally all submissions by a claimant, *see EF v. Derwinski,* 1 Vet.App. 324, 326 (1991); 38 C.F.R. § 20.202 (1994) (arguments in VA Form 1–9 (Substantive Appeal to Board) will be construed "in a liberal manner for purposes of determining whether they raise issues on appeal"). Against this background, we conclude that the facts of this case—the pro se veteran's ambiguous May 1993 letter and his representative's subsequent July 1993 written presentation incorporating and reoffering the November 1991 written presentation—created a reasonable doubt as to whether the veteran had withdrawn the right-knee claim from his appeal to the BVA.

■ Under such circumstances, where it is not clear that a VA claimant has withdrawn a particular claim from an appeal to the BVA, it is not sufficient for the Board to conclude that there is an abandonment without providing an adequate statement of reasons or bases to support that conclusion, taking into account all of the facts relating to the status of the claim as well as the Secretary's obligations under *EF, supra. See* 38 U.S.C. § 7104(d)(1) (each BVA decision shall include written statement of Board's finding and con-

clusions, and reasons or bases for same, on all material issues of fact and law presented on record); *cf. Servello v. Derwinski,* 3 Vet. App. 196, 200–01 (1992) (remanding claim to BVA where Board had failed to evaluate relevant evidence); *Godwin v. Derwinski,* 1 Vet.App. 419, 425 (1991) (quoting *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990) for proposition that BVA conclusion that it had no duty to assist "must be supported by a 'written statement of . . . the reasons or bases for those findings and conclusions' "); *Myers v. Derwinski,* 1 Vet.App. 127, 130 (1991); *Gilbert v. Derwinski,* 1 Vet.App. 49, 56–57 (1990). In the instant case, the Court will not proceed to decide the abandonment question without the enlightenment which the Board's statement of reasons or bases is designed to provide both to the Court and the claimant. *See ibid; see also Landicho v. Brown,* 7 Vet.App. 42, 48 (1994) (this Court is not generally initial trier of fact); *Webster v. Derwinski,* 1 Vet.App. 155, 159 (1991). Accordingly, the Court will vacate the BVA decision as to the right-knee claim and remand that matter for the Board to provide an adequate statement of reasons or bases on the abandonment question and, if the Board finds, in view of all the facts pertaining to that claim, including the veteran's representative's July 1993 written presentation and its incorporation of the November 1991 presentation, that the claim has not been abandoned, for the Board to adjudicate the right-knee claim in accordance with applicable law and regulation.

### B. Service Connection for Residuals of Bunionectomy

■ *1. Original claim versus claim to reopen.* Service connection for VA disability compensation purposes will be awarded to a veteran who served on active duty during a period of war, or during a post–1946 peacetime period, for any disease or injury that was incurred in or aggravated by a veteran's active service or for certain diseases that were initially manifested, generally to a degree of 10% or more, within a specified presumption period after separation from service. *See* 38 U.S.C. §§ 1110, 1112, 1113(a), 1116, 1131, 1133(a), 1137; 38 C.F.R. §§ 3.303(a), 3.306, 3.307 (1994). A service-

connection claim must be accompanied by evidence which establishes that the claimant currently has the claimed disability. *See Brammer v. Derwinski,* 3 Vet.App. 223, 225 (1992) (absent "proof of a present disability[,] there can be no valid claim"); *Rabideau v. Derwinski,* 2 Vet.App. 141, 144 (1992).

The veteran applied for service connection for residuals of a right-foot bunionectomy in April 1988. His claim was denied by an RO decision dated December 15, 1988 (R. at 80–81, that denial was confirmed in November 1989, R. at 95–96), and his NOD was signed December 19, 1989, and filed with the RO on December 26, 1989 (R. at 99); in February 1991, the RO confirmed the denial again (R. at 119). An NOD is timely filed only when it is postmarked or filed within one year after the date of mailing of notice of the RO decision. *See* 38 U.S.C. § 7105(b)(1).

The RO, in December 1989, informed the veteran that its December 1988 decision remained unchanged and that he would need "new evidence" in order to have his claim reevaluated. R. at 95. Because the RO did not properly advise the veteran of the December 1988 decision, *see* R. at 104, 107, that decision did not become final until the RO mailed the veteran notice of it or of the November 1989 decision. The December 19, 1989, NOD was thus timely filed, and, hence, the BVA did not err in treating this claim for service connection for bunionectomy residuals as an original claim and not a claim to reopen. *See* 38 U.S.C. §§ 5107(a), 5108; *Suttmann,* 5 Vet.App. at 135–36 (discussing difference between original claim and claim to reopen).

■ *2. Presumption of sound condition.* The veteran's claim was subject to 38 U.S.C. § 1111, which provides:

[E]very veteran [of wartime service] shall be taken to have been in sound condition when examined, accepted, and enrolled for service, except as to defects, infirmities, or disorders noted at the time of the examination, acceptance, and enrollment, or where clear and unmistakable evidence demonstrates that the injury or disease existed before acceptance and enrollment and was not aggravated by such service.

*See also* 38 U.S.C. § 1137 (extending wartime service presumption of section 1111 to post–1946 peacetime service); 38 C.F.R. § 3.304(b) (1994). The Board determined that the presumption of sound condition did not attach as to the veteran's claim for service connection for residuals of a right-foot bunionectomy because bunions had been noted on his entrance examination and he "had reported at entrance that he experienced pain associated with the bunion deformity". R. at 9.

Notwithstanding the Board's statement that the veteran had reported "pain" at his entrance examination, the record does not contain any notation that he was having or had reported pain due to bunions at the time he entered service. Indeed, the August 1985 Navy orthopedic examination report noted shortly before his induction: "No problem [with] feet.... No special shoes or orthotics." R. at 63. The Secretary argues that the BVA was referring to statements of patient history accompanying January 1987 SMRs. Br. at 7 (citing R. at 64–65). However, these records are only partially legible and their meaning is not clear.

Nevertheless, even though the veteran's bunions may have been asymptomatic at the time of his induction, they were "noted" on the Navy induction medical examination report and the accompanying orthopedic examination report. R. at 61–63; *see* 38 C.F.R. § 3.304(b); *Crowe v. Brown,* 7 Vet.App. 238, 245 (1994); *Parker v. Derwinski,* 1 Vet.App. 522, 524 (1991). "The presumption [of sound condition] ... attaches [only] where there has been an induction examination in which the later complained-of disability was *not* detected." *Bagby v. Derwinski,* 1 Vet.App. 225, 227 (1991) (emphasis added). The Board therefore was not in error in determining that the bunion disorder was a preexisting condition.

■ *3. Presumption of aggravation.* If a disease or injury preexisted service, the following presumption of aggravation may apply:

A preexisting injury or disease will be considered to have been aggravated by active military, naval, or air service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease.

38 U.S.C. § 1153; *see also* 38 C.F.R. § 3.306. The determination whether a disability found to be preexisting was aggravated by service is a question of fact. *See Doran v. Brown,* 6 Vet.App. 283, 286 (1994) (citing *Green v. Derwinski,* 1 Vet.App. 320, 322 (1991)). Factual determinations are reviewed under the "clearly erroneous" standard: "if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert,* 1 Vet.App. at 53, 38 U.S.C. § 7261(a)(4).

The Board found that the presumption of aggravation did not attach because the right-foot condition did not worsen in service beyond the natural progress of the disease. R. at 10. As to the veteran's assertion that the bunionectomy had left him with right-foot numbness and limitation of motion in his right great toe, the BVA stated: "[W]e point out not only that the record fails to establish such residuals, but also that the effects of surgical treatment in service ... will not be service-connected in the absence of other evidence demonstrating an increase in the disability." *Ibid.* (citing 38 C.F.R. § 3.306(b)(1)). The Board thus rested its decision on alternative grounds: (1) That the medical evidence did not show limitation of motion of the right great toe or numbness of the right foot, and (2) that, even if these symptoms had been present and had been a result of the in-service bunionectomy, such residuals could not be service connected because, pursuant to 38 C.F.R. § 3.306(b)(1), they were the result of ameliorative surgery and there was no increase in the "underlying pathology" during service. R. at 10. The Court will examine these alternative grounds separately.

■ *a. Medical evidence as to right-foot claim.* Although the veteran does have a diagnosis of a right-foot condition (*see* R. at 59, 86, 93), the BVA was correct that the record does not reveal a recent medical diagnosis of limitation of motion of the right great toe or numbness of the right foot. The last medical evaluation references to the veteran's right-foot bunion residuals were in

June and July 1988, within ten months after his bunionectomy and almost six years before the BVA decision. The January 1989 VA medical examination and x-ray reports referred to an injury to the veteran's fourth and fifth toes and discoloration and swelling of those toes, but did not mention any bunionectomy residuals. R. at 91–92. The September 1990 VA examination did not mention the veteran's right foot. *See* R. at 115–16. The Court will thus vacate the BVA decision as to the right-foot claim and remand the matter for a comprehensive medical examination of the veteran's right foot, with all medical records reviewed by the examiner. *See Suttmann*, 5 Vet.App. at 138; *Green (Victor) v. Derwinski*, 1 Vet.App. 121, 124 (1991). The examiner should express an opinion as to the origin of the "healed march fractures" noted in January 1989, and as to the degree of worsening, if any, of the veteran's preexisting right-foot condition by the time of his discharge from service. *See Wilson (Lawrence) v. Derwinski*, 2 Vet.App. 16, 21 (1991); *Hunt v. Derwinski*, 1 Vet.App. 292, 296 (1991); *Green, supra; see also* 38 C.F.R. §§ 4.1 (in the examination and evaluation of disability, each disability must be viewed in relation to its history); 4.2 (if a medical examination report does not contain sufficient detail, RO must return the report as inadequate for evaluation purposes) (1994).

**b. *Increase in underlying pathology.*** VA regulations provide:

> The usual effects of medical and surgical treatment in service, having the effect of ameliorating disease or other conditions incurred before enlistment, including postoperative scars, absent or poorly functioning parts or organs, will not be considered service connected unless the disease or injury is otherwise aggravated by service.

38 C.F.R. § 3.306(b)(1). The BVA relied upon this regulation, in the alternative, to deny service connection for right-foot-bunionectomy residuals because "evidence of an increase in underlying pathology in service is absent" and "the remedial measure undertaken, surgical correction of the bunion deformity, was successful." R. at 10.

The appellant argues that the history of amendments to § 3.306(b)(1) indicates that service connection is available for current residuals of medical or surgical treatment performed during service for a condition that predated service, because the existence of "residuals" necessarily means that there has been an increase in disability. Supplemental Memorandum (Suppl.Mem.) at 6 (quoting Regulation 1063(I), the predecessor to § 3.306(b)(1)). He also argues that the Court should "construe 38 C.F.R. § 3.306(b)(1) in a manner consistent with ... Regulation 1063(I)" (the Secretary concedes that 3.306(b)(1) was derived from 1063(I)), and "resolve any interpretive doubt in favor of the veteran." Suppl. Mem. at 6 (quoting *Allen v. Brown*, 7 Vet.App. 439 (1995) (citing *Brown v. Gardner*, — U.S. ——, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994))). The Secretary asserts that § 3.306(b)(1) was promulgated pursuant to the Secretary's "general rule-making authority" codified in 38 U.S.C. § 501(a) and to "the statutory scheme contained in Chapter 11, Title 38[,] ... specifically 38 U.S.C. § 1110." Suppl. Mem. at 7. He argues that § 3.306(b)(1) does not allow service connection for residuals of medical treatment when there has been no increase during service in overall disability due to the preexisting condition. Br. at 5. The National Organization of Veterans Advocates (NOVA), as amicus curiae, agrees with the appellant that any residuals of in-service medical or surgical treatment should be considered an increase in disability. Amicus Mem. at 6. NOVA also argues that (1) § 3.306(b)(1) conflicts with 38 U.S.C. § 1153 because the regulation provides that results of in-service medical and surgical treatment are never service connectable if they result in "postoperative scars [or] absent or poorly functioning parts or organs"; and (2) the regulation improperly shifts the burden of proof as set forth in section 1153. Amicus Mem. at 4, 6–7.

The interpretation of 38 C.F.R. § 3.306(b)(1) is an issue of first impression for this Court. The statutory authority cited for § 3.306, as a general matter, is 38 U.S.C. § 1153. If a regulation exceeds the authority of the Secretary, the Court must hold it unlawful. *See* 38 U.S.C. § 7261(a)(3)(C); *Gregory v. Brown*, 5 Vet.App. 108, 112 (1993); *Gardner v. Derwinski*, 1 Vet.App.

584, 586 (1991), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed.Cir.1993), *aff'd*, —— U.S. ——, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

This Court has spoken authoritatively to the interpretation of section 1153 and the aggravation of preexisting disabilities during service. In *Hensley v. Brown*, the Court held:

> Ratings for disabilities aggravated by service are determined by "deduct[ing] from the present degree of disability the degree, if ascertainable, of the disability existing at the time of entrance into active service, in terms of the rating schedule".

*Hensley*, 5 Vet.App. 155, 161 (1993) (citing 38 C.F.R. § 4.22). The Court made clear in *Hensley* that service connection for aggravation of a disability includes only the degree by which the disability increased in severity during service. In addition, the Court stated in *Hunt*:

> Given the plain meaning of 38 U.S.C. § 353 [now 38 U.S.C. § 1153] and the purposes of the veterans disability laws, we hold that temporary or intermittent flare-ups during service of a preexisting injury or disease are not sufficient to be considered "aggravation in service" **unless the underlying condition, as contrasted to the symptoms, is worsened.**

*Hunt, supra* (emphasis added).

A condition that worsened during service and then improved due to in-service treatment to the point that it was no more disabling than it was at induction is analogous to a condition that has flared up temporarily as described in *Hunt*. In both *Hunt* and *Hensley*, although there was a point during service where the condition was worse than it was at induction, the degree of disability due to the disorder did not increase between the dates of entrance and separation. *See Hunt* and *Hensley*, both *supra*. For example, if strengthening exercises are prescribed in service for a veteran with preexisting lower back pain that has worsened in service and the veteran does those exercises and his back improves so that it is no worse than it was at induction, service connection would not cover the condition of the veteran's back before medical treatment. The appellant argues that § 3.306(b)(1) provides that aggravation can be measured based on the difference in the degree of disability between the date of induction and the date of medical or surgical treatment, even where the disability was no worse overall at separation than at induction. He relies in part on the wording of the superseded Regulation 1063(I), which referred to the "degree of disability resulting from enucleations". It is not necessary for the Court to decide whether it would be proper to consider Regulation 1063(I) in the interpretation of 3.306(b)(1), because Regulation 1063(I) does not support the appellant's position—it specifically stated that the "mere fact of enucleation will not establish aggravation". Furthermore, if the Court were to interpret § 3.306(b)(1) as the appellant urges, then that regulation would conflict with the plain language of section 1153 as interpreted in *Hensley* and *Hunt*, both *supra. See Brown v. Gardner*, —— U.S. ——, ——, 115 S.Ct. 552, 557, 130 L.Ed.2d 462 (1994) (citing *Chevron v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). For the following reasons, the regulation does not bear the appellant's reading.

 The regulation provides that the "ameliorating" "usual effects" of "medical or surgical treatment" "will not be considered service connected unless the disease or injury is otherwise aggravated by service". Thus, the only treatment effects that are not considered service connected are those that improved the condition and lowered the level of disability. If a preexisting disability was more severe after in-service medical treatment, the increase in the level of disability would be service connectable. For example, if a preexisting 20% disability increased in severity in service to 60% disabling, and medical or surgical treatment reduced the degree of disability to 40%, the remaining 20% in-service increase is service connectable. The appellant would interpret the words in § 3.306(b)(1) "unless the disease or injury was otherwise aggravated by service" to mean that the disability in the above example would be service connectable at 40% because the increase in disability during service from 20% to 60% was due to factors "other" than medical or surgical treatment.

However, it is at least as reasonable (and far more in accord with the statutory scheme) to interpret the words "otherwise aggravated" as referring to the 20% remaining increase in the disability—the amount of aggravation remaining—after the ameliorative effects of surgical and medical treatment have been considered.

■ NOVA argues that § 3.306(b)(1) reverses the burden of proof (the presumption of aggravation) provided for in 38 U.S.C. § 1153. Amicus Mem. at 6–7. However, the question whether there has been an increase in disability during service must be answered in the affirmative before the presumption of aggravation attaches, *see Hunt, supra,* and § 3.306(b)(1) has to do with the definition of an increase in disability. Thus, the section 1153 burden of proof is unaffected by § 3.306(b)(1). NOVA further argues that § 3.306(b)(1) is inconsistent with section 1153 because the regulation would never allow service connection for "postoperative scars" or "absent or poorly functioning parts or organs" treated in service. Amicus Mem. at 4. This reading of the regulation assumes that the phrase "including postoperative scars, absent or poorly functioning parts or organs" modifies the subject of the sentence ("usual effects of medical and surgical treatment in service") rather than the words that immediately precede the phrase ("disease or other conditions incurred before enlistment"). Although the regulation is not a model of good drafting (and could benefit from a Secretarial review, *see e.g., Hatlestad v. Derwinski,* 3 Vet.App. 213, 216 (1992) (quoting *Talley v. Derwinski,* 2 Vet.App. 282, 286–87 (1992)), it would be contrary to accepted rules of construction to read the regulation in a way that is both contrary to its plain language and in conflict with section 1153 and the Court's caselaw interpreting that statute. *See Smith (William) v. Brown,* 35 F.3d 1516, 1526 (Fed.Cir.1994) (citing *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n,* 866 F.2d 616, 623 (3d Cir.1989), for the proposition that regulations must be construed to avoid conflict with a statute if fairly possible)).

■ The Court holds that where a preexisting disability has been medically or surgically treated during service and the usual effects of the treatment have ameliorated the disability so that it is no more disabling than it was at entry into service, the presumption of aggravation does not attach as to that disability. *Cf. Hunt, supra.*

The appellant argues that although the pain from his bunion may have been alleviated by the bunionectomy, the operation left him with limitation of motion in his right great toe and numbness of his right foot. This raises the question whether an increase in disability can be service connected as aggravation if in-service medical or surgical treatment results in an improvement in one facet of a disability but leads to an increase in another facet of a disability. Section 1153 refers to an increase in disability due to a "preexisting injury or disease", and § 3.306(b)(1) refers to a "disease or injury", thus indicating that aggravation is to be measured in terms of a *particular* injury or disease and the disability resulting from that injury or disease. Hence, when a disability has been made worse in one respect and improved in another respect by in-service medical or surgical treatment, the rating schedule should be used to determine if the overall degree of disability has increased during service. *See* 38 C.F.R. § 4.22; *Hensley, supra.* (The VA rating schedule provides for rating of various aspects of disabilities. *See* 38 U.S.C. § 1155. For example, a knee injury might be rated in terms of limitation of motion and in terms of osteomyelitis. *See* 38 C.F.R. § 4.71a, Diagnostic Codes 5000, 5260, 5261 (1994).)

The appellant argues, in the alternative, that the veteran's right-foot condition was more disabling at separation than it was at induction, and that it remains so today. In part II.B.3.a., the Court held that on remand, the BVA must order a contemporaneous examination of the veteran's right foot. On readjudication, the BVA must also assess the results of that examination in connection with the Court's holding today as to the interpretation of § 3.306(b)(1) in determining whether the veteran's right-foot condition was aggravated in service within the meaning of this opinion and *Hunt, supra.*

### III. Conclusion

The Court vacates the February 7, 1994, BVA decision and remands the matters of an increased rating for the right-knee disability (for expeditious proceedings consistent with this opinion) and service connection for aggravation of the right-foot condition (for expeditious further development and readjudication) on the basis of all applicable law and regulation, and issuance of a new decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 1153, 5107, 7104(d)(1), 7261; 38 C.F.R. § 3.306; *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991); *Gilbert, supra*—all consistent with this opinion. *See* Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (requiring Secretary to provide for "expeditious treatment" for claims "remanded" by BVA or the Court); *Allday v. Brown*, 7 Vet.App. 517, 533–34 (1995). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

VACATED AND REMANDED.

HOLDAWAY, *Judge,* concurring in part and dissenting in part:

I concur as to that part of the opinion concerning the claim for residuals of a bunionectomy. As to the right knee disability, the letter from the appellant to his representative agreeing to the 10% rating is clear and unequivocal. I find no ambiguity whatever in that letter; he abandoned any appeal he may have had as to a higher rating for his right knee disability. I would further opine that if a clear and unequivocal withdrawal is made by a claimant, *and he is the one who, later, introduces "ambiguity" into the withdrawal,* then he should bear the burden of establishing that the claim was *not* withdrawn.