Werner LENDENMANN, Appellant,

v.

Anthony J. PRINCIPI, Acting Secretary of Veterans Affairs, Appellee.

No. 91–1235.

United States Court of Veterans Appeals.

Decided Oct. 9, 1992.

As Amended Nov. 5, 1992.

veteran filed an application for a total rating based on individual unemployability, and the BVA determined that that claim was not sufficiently developed for appellate review by the BVA and directed the claim to the originating agency for appropriate action. *Werner Lendenmann*, BVA 91–19229, at 2 (May 28, 1991). The Court has jurisdiction of the case under 38 U.S.C. § 7252(a) (formerly § 4052(a)). For the reasons set out below, the Court affirms the decision of the BVA in part and vacates and remands it in part.

## FACTUAL BACKGROUND

The veteran served in the United States Navy from June 1943 to June 1963. R. at 1. In March 1987, the veteran underwent coronary artery bypass graft surgery, and in September 1987, a private physician reported that the veteran had been troubled by pain and weakness involving the left arm since the surgery. *Id.* The veteran had been seen earlier that year by a neurologist who thought Mr. Lendenmann might have sustained a brachial plexus injury. R. at 27–30. Brachial plexus is defined as "a complex network of nerves that is formed chiefly by the lower four cervical nerves and the first thoracic nerve, lies partly within the axilla, and supplies nerves to the chest, shoulder, and arm." WEBSTER'S MEDICAL DESK DICTIONARY 84 (1986). The veteran was later granted service connection for brachial plexus injury. R. at 128.

In April 1988, on VA Form 21–2545, Report of Medical Examination for Disability Evaluation, the veteran reported that "[s]ince surgery [in March 1987,] my sense of balance has been reduced" and that "[a]ny movement makes me feel 'tipsy'" and "long periods make me sick to my stomach." R. at 60. In a Veterans' Administration (now Department of Veterans Affairs) (VA) neurological examination report dated April 21, 1988, the neurologist noted, inter alia:

The patient says that he also suffered some injury to his medulla, due to cerebral ischemia/hypoxia, which has resulted in poor balance and nausea, which

Werner Lendenmann, pro se.

James A. Endicott, Jr., Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, Andrew J. Mullen, Deputy Asst. Gen. Counsel, and R. Randall Campbell, were on the pleadings, for appellee.

Before KRAMER, MANKIN and IVERS, Associate Judges.

IVERS, Associate Judge:

Werner Lendenmann appeals a May 28, 1991, Board of Veterans' Appeals (BVA or Board) decision which denied his claim for increased (compensable) evaluations for right ear deafness and a balance disorder. The Court notes that in October 1990 the

complicate to some degree his efforts at rehabilitation with a walking program. R. at 65. With regard to the veteran's hearing loss, the neurologist observed: "Hearing in the right ear is markedly decreased to air conduction. Weber lateralizes to the right." R. at 69. A Weber test is "a test to determine the nature of unilateral hearing loss...." WEBSTER'S MEDICAL DESK DICTIONARY 767.

In February 1989, the veteran reported for another VA examination (R. at 73–84), stating that his "[p]rincipal complaint relates to loss of sense of balance with body movement and nausea with continued body movement." R. at 73. The VA examining physician rendered several neurological diagnoses, including "midline cerebellar degeneration." R. at 84. A rating decision in May 1989 increased the evaluation for brachial plexus injury to 30% and denied service connection for midline cerebellar degeneration, secondary to treatment for service-connected heart disease. R. at 128.

In May 1989, a private physician wrote that the veteran's problems following his March 1987 surgery "include infarction of a part of his medulla oblongata affecting his balance." R. at 118. Infarction or infarct is defined as "an area of necrosis in a tissue or organ resulting from obstruction of the local circulation by a thrombus or embolus." WEBSTER'S MEDICAL DESK DICTIONARY 334. Necrosis is the "death of a portion of tissue; *specif:* death of a portion of tissue differentially affected by local injury (as loss of blood supply, corrosion, burning, or local lesion of a disease)." *Id.* at 466. Medulla oblongata is

the somewhat pyramidal last part of the vertebrate brain developed from the posterior portion of the hindbrain and continuous posteriorly with the spinal cord, enclosing the fourth ventricle, and containing nuclei associated with most of the cranial nerves, major fiber tracts and decussations that link spinal with higher centers, and various centers mediating the control of involuntary vital function (as respiration).

*Id.* at 418.

In June 1989, another of Mr. Lendenmann's private physicians, Dr. Mark Kritchevsky, wrote a letter disagreeing with the VA neurologist's diagnosis of "midline cerebellar degeneration":

Mr. Lendenmann does not suffer from "midline cerebellar degeneration." He has a stable cerebellar injury. The likely cause of this injury is some brief relative hypotension that occurred during his cardiac surgery, as his ataxia first was apparent immediately following the surgery and has not changed subsequently.

R. at 88. Ataxia is "an inability to coordinate voluntary muscular movements that is symptomatic of some nervous disorders." WEBSTER'S MEDICAL DESK DICTIONARY 54. Three months before writing this letter, Dr. Kritchevsky had written in a progress record that the veteran's "balance continues to be a big problem for him and may be due to a mild cerebellar syndrome from the surgery." R. at 116. Cerebellar syndrome is defined as "a cerebellar deficiency manifested chiefly by slurred speech, slow and clumsy movement of the limbs, and' staggering gait." MELLONI'S ILLUSTRATED MEDICAL DICTIONARY 93 (2d ed. 1985).

In July 1989, Dr. Kritchevsky wrote another letter, again expressing disagreement with the VA's attributing Mr. Lendenmann's balance problems to midline cerebellar degeneration:

The VA continues to assert that Mr. Lendenmann's balance problems are due to "midline cerebellar degeneration." I have followed Mr. Lendenmann since April, 1987. Throughout this time he has complained of a balance problem. There has been no worsening of this problem over two years and three months. Any "degeneration" ought to worsen with time and I do not see how he could be suffering from a "midline cerebellar degeneration." His history is very straightforward. His balance problem was not present prior to his cardiac surgery; he first noted it following the cardiac surgery. This history is strongly suggestive of a not uncommon complication of major cardiac surgery. The patient's complaints and balance problems

are absolutely consistent with a mild ischemic injury to the cerebellum.

R. at 117. Ischemia is defined as "[h]ypoemia; local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." STEDMAN'S MEDICAL DICTIONARY 728 (5th ed. 1982).

On September 5, 1990, the BVA issued two separate decisions on the veteran's claims. R. at 121–33. The decisions included these results: (1) the BVA remanded the veteran's claim for entitlement to an increased (compensable) evaluation for right ear deafness because "the veteran had not had the benefit of an evaluation of his right ear defective hearing under the new rating criteria" (R. at 125–26); and (2) the BVA granted service connection for "a balance disorder which is proximately due to or the result of a service-connected disease or injury." R. at 131. With regard to the remand on the issue of right ear deafness, the BVA ordered that the veteran "be provided an audiometric examination by the VA in order to determine the nature, extent, and status of his service-connected right ear defective hearing." R. at 126.

On September 27, 1990, the Regional Office (RO) issued a rating decision assigning the balance disorder a noncompensable rating evaluation and noting as follows:

It was held that [service connection] was established for a balance disorder secondary to coronary artery bypass surgery. Cited examination noted complaints of episodes of loss of balance. These seem to occur after activity. The feeling is more of a light-headedness in addition to imbalance, rather than a vertiginous feeling. The balance disorder is only slightly symptomatic.

R. at 134. Two diagnostic codes joined by a hyphen, "8099–6204", were used to describe the disability for "[b]alance disorder." R. at 135. There is no diagnostic code "8099"; however, the VA's ADJUDICATION PROCEDURE MANUAL, M21–1 provides in paragraph 49.18(c)(1) that "[w]hen rating any unlisted condition by analogy, a built-up diagnostic code number ending with '99' will be employed, followed by an additional specific diagnostic code after a hyphen to identify the basis for the assigned evaluation." See 38 C.F.R. § 4.27 (1991). The "additional specific" diagnostic code employed by the VA here was "6204," which is for "Labyrinthitis, chronic." 38 C.F.R. § 4.87a, DC 6204 (1991). Labyrinthitis is "inflammation of the labyrinth of the internal ear." WEBSTER'S MEDICAL DESK DICTIONARY 370. On October 22, 1990, the VA received the veteran's notice of disagreement (NOD) with the September 27, 1990, rating decision. R. at 137.

A Statement of the Case (SOC), dated November 13, 1990, was sent to the veteran in response to his NOD. R. at 146–48. Under the PERTINENT LAWS; REGULATIONS; RATING SCHEDULE PROVISIONS section of the SOC, the following was written:

Chronic labyrinthitis, moderate with tinnitus and occasional dizziness is ten percent (10%); severe, with tinnitus, dizziness and occasional staggering, 30%. (38 CFR 4.84b; DC 6204) In every instance where the minimum schedular evaluation requires residuals and the schedule does not provide a no-percent (zero percent (0%)) evaluation, a no-percent (zero percent (0%)) evaluation will be assigned when the required residuals are not shown. (38 CFR 4.31)

R. at 147. In response to the SOC, the veteran filed his substantive appeal to the BVA on VA Form 1–9 which was received by the VA on November 15, 1990. R. at 149. On his Form 1–9, the veteran commented as follows:

It appears to a layman that in the "Statement of the Case" dated November 13, 1990, my balance problem is attributed to the condition of my right ear (See para 3 under "Pertinent Laws ..."). As stated many times in previous correspondence from me and my physicians (the latest by Douglas Galasko, M.D., dated September 12, 1990, copy attached) my balance problem is the result of two open-heart operations and not to [sic] the operation to my right ear. My information is that the balance problem has nothing to do with the ear but to damage to the portion of the brain involved in providing balance to my body.

R. at 149. Dr. Galasko maintained, inter alia, that Mr. Lendenmann's "ulnar palsy and cerebellar gait ataxia are [r]esidual from the coronary bypass surgery." R. at 150.

Pursuant to the September 5, 1990, BVA remand on the matter of right ear deafness, the VA administered a controlled speech discrimination test and a puretone audiometry examination to the veteran on November 7, 1990. R. at 142–44. The results of these examinations showed that the veteran suffered "severe profound combined [hearing] loss" in the right ear and "mild-moderate combined loss" in the left ear. R. at 142. On November 19, 1990, the RO issued a rating decision confirming the noncompensable evaluation for right ear hearing loss. R. at 152.

On January 16, 1991, the VA issued a Rating Decision on Appeal, confirming both the decision denying an increased (compensable) evaluation for a balance disorder and the decision denying an increased (compensable) evaluation for right ear hearing loss. R. at 158. Subsequently, the VA received an undated Informal Hearing Memorandum from the veteran's service representative which stated in pertinent part as follows:

> In the [BVA decision] dated September 5, 1990, it was concluded that the veteran's balance disorder is consistent with ischemic injury to the cerebellum occurring during coronary artery bypass surgery.
>
> When the claim was returned to the agency of original jurisdiction for initial evaluation of that disorder, the Rating Board assigned a noncompensable rating under Code 8099–6204 as secondary to the service connected cardiovascular disability. This recognizes the neurological basis of the disorder but equates the symptoms to labyrinthitis which requires moderate disability with tinnitus and occasional dizziness.
>
> We believe the balance disorder is more properly rated by analogy to Codes 8007–8009 which recognizes [sic] the car-

diovascular basis and calls for a <u>minimum</u> rating of 10%.

R. at 159 (underlining in original).

With respect to the denial of a compensable rating for defective hearing, the veteran's representative noted, "We can not [sic] quarrel with the rating under present criteria" and then expressed general disagreement with the rating criteria for hearing loss evaluations. *Id.*

## ANALYSIS

*I. Denial of the Claim for a Compensable Evaluation for Service-connected Hearing Loss.*

██ Assignment of disability ratings for hearing impairment are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are rendered. In this case the numeric designations produce a noncompensable disability rating. 38 C.F.R. § 4.87, table VII. Because the Court can find no error on the part of the VA or the Board in applying the rating schedule to the results of the audiometric examination, the Court holds that appellant has not demonstrated that the BVA committed either legal or factual error which would warrant reversal or remand. Accordingly, that part of the BVA decision denying a compensable evaluation for the veteran's hearing loss is affirmed.

*II. Choice of an Analogous Diagnostic Code for a Disorder not Coded in the Schedule of Ratings.*

██ The Court recognizes that when the regulations do not provide diagnostic codes for specific disorders, the VA must evaluate those conditions under codes for similar or analogous disorders. *Pernorio v. Derwinski*, 2 Vet.App. 625, 629 (1992). In this regard, the Secretary promulgated § 4.20 of the regulations which provides as follows:

> When an unlisted condition is encountered it will be permissible to rate under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symp-

tomatology are closely analogous. Conjectural analogies will be avoided, as will the use of analogous ratings for conditions of doubtful diagnosis, or for those not fully supported by clinical and laboratory findings. Nor will ratings assigned to organic diseases and injuries be assigned by analogy to conditions of functional origin.

38 C.F.R. § 4.20 (1991). In addition, another regulation concerned with the "use of diagnostic code numbers" provides in pertinent part as follows:

When an unlisted disease, injury, or residual condition is encountered, requiring rating by analogy, the diagnostic code number will be "built-up" as follows: The first 2 digits will be selected from that part of the schedule most closely identifying the part, or system, of the body involved; the last 2 digits will be "99" for all unlisted conditions.

In denying the veteran's claim for a compensable rating for his service-connected balance disorder, the BVA noted, inter alia, the following:

There is no specific diagnostic code for rating an ischemic injury to the cerebellum manifested by balance problems. Therefore, the veteran's service-connected balance problem is rated as analogous to chronic labyrinthitis.... Mindful of the veteran's representative's contentions, this panel has reviewed various alternatives for rating the veteran's service-connected balance disorder. We find that Diagnostic Codes 8007 and 8009, as recommended, are not representative of the actual manifestations associated with the mild cerebral ischemic injury. We have also explored other possible options to rating the service-connected balance disorder, but upon reflection, conclude that the most accurate representation of disability is under the diagnostic code for labyrinthitis.

*Lendenmann,* BVA 91–19229, at 2. Although the Board also describes in more detail the veteran's symptoms and its conclusion regarding those symptoms and the level of his disability, it says no more regarding its choice of an analogous diagnostic code.

The lack of reasons or bases for the Board's decision favoring one diagnostic code over others "frustrates effective judicial review" in this case. *Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990), *quoting Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). In this regard, the Court observes that all the medical evidence of record, both VA and private, describes the cause of the veteran's balance disorder as something that happened inside his brain during coronary artery surgery. The Board agrees that such an occurrence or injury to the brain is the *cause* of the veteran's balance disorder—"an ischemic injury to the cerebellum manifested by balance problems" is what the BVA has termed the condition in its decision. *Lendenmann,* BVA 91–19229, at 6. None of the evidence points to any problems with the veteran's ears as the *cause* of the veteran's balance disorder. However, instead of choosing a diagnostic code for an ailment analogous to the *cause* of the veteran's ailment, the BVA has chosen a diagnostic code of an ailment whose *symptoms,* which include dizziness, are analogous to the veteran's *symptoms,* i.e., loss of balance. It is precisely this difference which the appellant and his representative addressed in the VA Form 1–9 and Informal Hearing Memorandum when they questioned the use of the diagnostic code for labyrinthitis instead of one that "recognizes the cardiovascular basis" of the balance disorder. R. at 159. In its decision, the BVA says that the suggested diagnostic codes for a brain embolism, thrombosis, or hemorrhage "are not representative of the actual *manifestations* associated with the mild cerebral ischemic injury." *Lendenmann,* BVA 91–19229, at 7 (emphasis added). However, it does not explain upon what regulatory authority it bases a decision to use a diagnostic code analogous to the symptoms of an ailment rather than one analogous to the ailment itself.

■ Section 4.20 of the regulations provides that "when an unlisted condition is encountered it will be permissible to rate

under *a closely related disease or injury* in which not only the *functions affected,* but the *anatomical localization* and *symptomatology* are closely analogous." 38 C.F.R. § 4.20 (emphasis added). This regulation allows the VA to rate an unlisted ailment under the criteria provided for "a closely related disease or injury" that is listed. In deciding whether a listed disease or injury is "closely related" to the veteran's ailment, the VA may take into consideration three factors: (1) whether the "functions affected" by the ailments are analogous; (2) whether the "anatomical localization" of the ailments is analogous; and (3) whether the "symptomatology" of the ailments is analogous. Here, the BVA considered the symptoms of labyrinthitis analogous to the veteran's symptoms. It appears that based on this one similarity, the Board concluded that labyrinthitis was "a closely related disease or injury" to the veteran's unlisted ischemic injury of the cerebellum.

However, the Board did not explain how the "anatomical localization" of labyrinthitis, an inflammation of the ear, is more analogous to an ischemic injury to the brain than is a brain embolism or hemorrhage. Nor did the Board explain whether it considered the "functions affected" by the ailments and whether those functions were analogous. In short, the BVA did not explain why it accorded more weight to one factor in the regulation—analogous "symptomatology"—than it did to two other factors—"functions affected" and "anatomical localization." Moreover, the Board's decision did not provide reasons or bases for why the application of this regulatory analysis for determining "a closely related disease or injury" showed labyrinthitis, an ailment of the ear, to be a more closely related disorder to an ischemic injury of the cerebellum, a brain injury, than a brain embolism or brain hemorrhage would be.

Because the Board failed to provide adequate reasons or bases for its choice of DC 6204 for labyrinthitis rather than codes 8007–8009 for injuries to the vessels of the brain caused by embolism, thrombosis, or hemorrhage, the case must be remanded. *Gilbert,* 1 Vet.App. at 56–57; *see also*

*Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991). The Court observes, as did appellant's representative, that the determination is a matter of considerable consequence for appellant, since under the rating criteria for labyrinthitis the Board determined that appellant's disorder was noncompensable, whereas the 8007–8009 series requires a minimum rating of 10%. Therefore, the Court expects that upon remand the BVA will heed the admonishment of this Court in *Fletcher* with regard to the purpose of remand:

> We do not mean to imply that a remand, such as is done here, is merely for the purposes of rewriting the opinion so that it will superficially comply with the "reasons or bases" requirement of 38 U.S.C. § 7104(d)(1) (formerly § 4004). A remand is meant to entail a critical examination of the justification for the decision.

*Fletcher,* 1 Vet.App. at 397. Accordingly, the Court instructs the Board to reexamine the evidence of record, seek other evidence, if necessary, apply the appropriate regulations, particularly § 4.20, to the facts of the case, and issue a timely, well-supported decision.

## CONCLUSION

For the reasons stated above, the May 28, 1991, decision of the BVA is VACATED and REMANDED in part and AFFIRMED in part. With regard to the denial of a compensable rating for the veteran's balance disorder, we VACATE the decision and remand the matter for readjudication consistent with this opinion. We AFFIRM the decision of the Board denying the veteran's claim for an compensable rating for right ear hearing loss.