Citation Nr: 1452666 
Decision Date: 11/28/14 Archive Date: 12/02/14

DOCKET NO. 10-40 439 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for hypertension, including as due to 
service-connected posttraumatic stress disorder (PTSD).

2. Entitlement to a disability rating higher than 50 percent prior to April 8, 2011, and higher than 70 percent since, for the service-connected PTSD.

3. Entitlement to an initial compensable disability rating for service-connected bilateral hearing loss.


REPRESENTATION

Veteran represented by: Veterans of Foreign Wars of the United States


ATTORNEY FOR THE BOARD

C. Kedem, Counsel


INTRODUCTION

The Veteran served on active duty in the United States Army from February 1959 to January 1965 and in the United States Air Force from May 1966 to May 1970.

He appealed to the Board of Veterans' Appeals (Board/BVA) from an April 2009 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO). At the time, his PTSD was rated as 50-percent disabling, and the RO declined to increase that rating. Subsequently, however, in a September 2012 decision since issued during the pendency of this appeal, the RO granted a higher 70 percent rating for the PTSD retroactively effective from April 8, 2011. He also was granted a total disability rating based on individual unemployability (TDIU) as of that same date. But nonetheless, regarding the rating for the PTSD, the United States Court of Appeals for Veterans Claims (CAVC/Court) has held that a decision awarding a higher rating, but less than the maximum possible rating, does not abrogate the pending appeal. AB v. Brown, 6 Vet. App. 35, 38-39 (1993). Thus, this claim now concerns whether a rating higher than 50 percent for the PTSD was warranted prior to April 8, 2011, and whether a rating higher than 70 percent has been warranted since.

In January 2014, the Board remanded these claims to the RO via the Appeals Management Center (AMC), since the Agency of Original Jurisdiction (AOJ), for further development and consideration that included obtaining outstanding relevant treatment records from the VA Medical Center (VAMC) in Tallahassee, Florida, or elsewhere, both prior to and since April 8, 2011, and then having the Veteran undergo a VA compensation examination reassessing the symptoms and consequent severity of his PTSD and a VA compensation examination, as well, reassessing the severity of his bilateral hearing loss.

Regrettably, the Board must again remand the claim of entitlement to service connection for hypertension, including as secondary to the PTSD, for still further development.


FINDINGS OF FACT

1. The Veteran has no more than Level III hearing loss in each ear, so bilaterally.

2. Both before and since April 8, 2011, however, his PTSD caused occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.


CONCLUSIONS OF LAW

1. The criteria are not met for an initial compensable rating for the Veteran's 
service-connected bilateral hearing loss. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.85, Diagnostic Code 6100, 4.86 (2014).

2. But the criteria are met for the higher 70 percent rating for his service-connected PTSD even before April 8, 2011, not just since, though not an even greater 100 percent schedular rating for this service-connected disability. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.130, Diagnostic Code 9411 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act of 2000 (VCAA)

As provided by the VCAA, VA has duties to notify and assist claimants in substantiating claims for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a) (2014). 

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his or her representative, if any, of any information, and any medical or lay evidence, which is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will obtain; and (3) that the claimant is expected to provide. 38 C.F.R. § 3.159(b)(1).

Ideally, this notice should be provided prior to an initial unfavorable decision on a claim by the RO as the AOJ. Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

In Dingess v. Nicholson, 19 Vet. App. 473 (2006), the Court held that, upon receipt of an application for a service-connection claim, 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b) require VA to review the information and evidence presented with the claim and provide the claimant notice of what information and evidence not previously provided, if any, will assist in substantiating, or is necessary to substantiate, each of the five elements of the claim, so both as concerning what is required to establish entitlement to service connection and that a "downstream" disability rating and an effective date for the award of benefits will be assigned if service connection is granted. 

Here, this VCAA duty to notify was satisfied by way of a letter sent to the Veteran in September 2008 that fully addressed all notice elements and was sent prior to the initial AOJ adjudication of the claims in April 2009, so in the preferred sequence. The letter duly informed the Veteran of what evidence was required to substantiate the claims and of his and VA's respective responsibilities in obtaining the necessary supporting evidence. He was also advised regarding the type of information mandated by the Court in Dingess.


As concerning the additional duty to assist the Veteran in fully developing his claims, this duty includes assisting him in the procurement of potentially relevant records, whether from prior to, during, or since his service, so including his service treatment records (STRs) and post-service treatment records and providing an examination for a medical opinion when needed to assist in deciding a claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159.

The Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudicing the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). The RO has obtained his STRs and post-service VA treatment records. He has not cited any relevant private treatment records needing to be obtained and considered. He was afforded three VA medical examinations concerning his claims - including, as already mentioned, following and as a result of the Board remanding them in January 2014. The resultant examination reports are comprehensive and based on a review of the record and thorough examination of him, including obtaining a complete medical history of his disabilities and their consequent effects on his functioning. Significantly, neither he nor his representative has identified, and the file does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claims that has not been obtained. Hence, no further notice or assistance is required. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002).

Standard of Review

After the evidence has been assembled, it is the Board's responsibility to evaluate the entire record. 38 U.S.C.A. § 7104(a) (West 2002). When there is an approximate balance of evidence regarding the merits of an issue material to the determination of a matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3 (2014) (reasonable doubt to be resolved in veteran's favor). In Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990), the Court stated that "a veteran need only demonstrate that there is an 'approximate balance of positive and negative evidence' in order to prevail." To deny a claim on its merits, the preponderance of the evidence must be against the claim. See Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

Increased Ratings

Disability evaluations are determined by the application of the Schedule for Rating Disabilities (Rating Schedule), which assigns ratings based on the average impairment of earning capacity resulting from a service-connected disability. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the veteran's condition. Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991). Staged ratings are appropriate for an increased-rating claim when the factual findings show distinct time periods where the service-connected disability exhibited symptoms that would warrant different ratings, irrespective of whether an initial or established rating. See Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors that would render application of the schedule impractical. Fisher v. Principi, 4 Vet. App. 57, 60 (1993). According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. 38 C.F.R. § 3.321(b)(1) (2014). See also Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, the Board must first determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the Board must determine whether the claimant's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the veteran's disability picture requires the assignment of an extraschedular rating.

In considering whether extra-schedular consideration is warranted, the Board has attributed all symptoms potentially referable to a service-connected disability to the disability. See generally Mittleider v. West, 11 Vet. App. 181, 182 (1998).

Bilateral Hearing Loss

The Veteran's service-connected bilateral (left and right ear) hearing loss has been rated initially as 0-percent disabling, i.e., noncompensable, under the provisions of 38 C.F.R. § 4.85, Diagnostic Code 6100.

Evaluations of defective hearing range from 0 to 100 percent. This is based on organic impairment of hearing acuity as measured by the results of controlled speech discrimination tests, together with the average hearing threshold level as measured by pure tone audiometric tests in the frequencies of 1000, 2000, 3000, and 4000 Hertz. To evaluate the degree of disability from service-connected hearing loss, the rating schedule establishes eleven auditory acuity levels ranging from numeric level I for essentially normal acuity through numeric level XI for profound deafness. 38 C.F.R. § 4.85, Tables VI and VII, Diagnostic Code 6100. 

The ratings for disability compensation for hearing loss are determined by the mechanical (nondiscretionary) application of the criteria in Table VI and Table VII. Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992).

When a Veteran evidences an exceptional pattern of hearing impairment, such as when the pure tone threshold at each of the four specified frequencies (1000, 2000, 3000, and 4000 Hertz) is 55 decibels or more, Table VI or Table VIa is to be used, whichever results in the higher numeral, to determine the Roman numeral designation for hearing impairment. 38 C.F.R. § 4.86(a). When the pure tone threshold is 30 decibels or less at 1000 Hertz, and 70 decibels or more at 2000 Hertz, Table VI or Table VIa again is to be used, whichever results in the higher number. Thereafter, that numeral will be elevated to the next higher numeral. 38 C.F.R. § 4.86(b).

On VA examination in March 2009, pure tone thresholds, in decibels, were as follows: 




HERTZ



1000
2000
3000
4000
Average
RIGHT
25
55
65
60
51
LEFT
25
60
60
70
54

Speech audiometry revealed speech recognition ability of 86 percent in the right ear and of 88 in the left ear.

These results correlate to Level II hearing loss bilaterally.

The examiner restated the Veteran's contention that he could not hear certain tones such as buzzers and alarms.


On VA examination in January 2012, pure tone thresholds, in decibels, were as follows: 




HERTZ



1000
2000
3000
4000
Average
RIGHT
35
55
70
75
59
LEFT
30
65
70
75
60

Speech audiometry revealed speech recognition ability of 88 percent in the right ear and of 84 in the left ear.

These results correlate to Level III hearing loss bilaterally. 

The examiner restated the Veteran's contention that his wife sounded like she was mumbling even with hearing aids, and that during his working life people had to repeat themselves. The examiner indicated that the Veteran's bilateral hearing loss would cause significant impact in a variety of situations, which could be alleviated with appropriate hearing aids. However, the Veteran's bilateral hearing loss did not render him unable to secure or maintain substantially gainful employment. 

During the most recent VA examination in April 2014, on remand, pure tone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
40
55
60
65
55
LEFT
35
65
75
80
64

Speech audiometry revealed speech recognition ability of 84 percent in the right ear and of 84 in the left ear.

These results correlate to Level II hearing loss in the right ear and Level III hearing loss in the left ear. 

The examiner noted that the functional impact of the service-connected bilateral hearing loss included the Veteran's inability to hear certain sounds, which made it difficult for the him to understand what was being said, especially in noisy environments. However, according to the examiner, the Veteran's hearing loss did not render him unable to pursue all forms gainful employment. Martinak v. Nicholson, 21 Vet. App. 447 (2007). In Martinak, the Court noted that, unlike the Rating Schedule for hearing loss, the extra-schedular provisions of 38 C.F.R. § 3.321(b)(1) do not rely exclusively on objective test results to determine whether referral for an extra-schedular rating was warranted. The Court held that, in addition to dictating objective test results, a VA audiologist must fully describe the functional effects caused by a hearing disability in his or her final report. See also Revised Disability Examination Worksheets, Fast Letter 07-10 (Dep't of Veterans Affairs Apr. 24, 2007); and 38 C.F.R. § 4.10 (2014).

An exceptional pattern of hearing loss has not been shown at any time since the filing of this claim, so Table VI (rather than Table VIa) has been used throughout this analysis to determine the numeric designation of hearing impairment. 38 C.F.R. §§ 4.85, 4.86.

At worst, the Veteran has had Level III hearing loss in both ears. Applying Level III and Level III hearing loss to Table VII corresponds to a 0 percent disability rating. As already explained, the ratings for disability compensation for hearing loss are determined by the mechanical (again, meaning nondiscretionary) application of the criteria in Table VI and Table VII. Lendenmann, 3 Vet. App. at 349. The evidence, as it stands, indicates that the Veteran's service-connected bilateral hearing loss has warranted no more than a 0-percent rating since the filing of his claim for this condition (effective date of the award). The Board resultantly cannot "stage" this rating since this represents his greatest level of impairment owing to this disability since receipt of this claim. Fenderson, 12 Vet. App. at 125.


As also already alluded to, in addition to dictating objective test results, a VA audiologist must fully describe the functional effects caused by a hearing loss disability in his her final report. Martinak, supra. In this case, and to this end, the April 2014 examiner indicated the only functional impairment was difficulty hearing in noisy environments, which the schedular rating criteria sufficiently contemplate. The April 2014 examiner's findings are not contradicted by information contained elsewhere in earlier examination reports.

The Court also has held that, if the claimant or the record reasonably raises the question of whether the Veteran is unemployable due to the disability for which an increased rating is sought, then part and parcel to that claim for an increased rating is whether a TDIU as a result of that disability is warranted. Rice v. Shinseki, 22 Vet. App. 447 (2009). Here, however, the Board need not address this matter because the Veteran as mentioned already has been granted a TDIU effectively as of April 8, 2011, and he has not contested the effective date.

The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extra-schedular basis. The Board has taken into account his complaints of decreased auditory acuity and speech recognition impairment. But the schedular rating criteria contemplate the limitations and impairment caused by his service-connected hearing loss disability. Indeed, there are provisions already in place for when a Veteran has an exceptional pattern of hearing impairment, see again 38 C.F.R. § 4.86(a) and (b), so an alternative way of rating his hearing loss disability when it does not follow or comport to the traditional pattern. The bilateral hearing loss disability rating on appeal is not one that is rated by analogy, but, instead, has been evaluated under applicable DC 6100, the schedular rating criteria of which specifically provide for ratings based on all levels of hearing loss, including, again, even exceptional hearing patterns that are not demonstrated in this case, and as measured by both audiologic testing and speech recognition testing. Speech recognition testing is a schedular rating criterion that recognizes such an inability to understand certain words in conversation. The fact that there may be occupational impact does not render the Rating Schedule inadequate to evaluate the level of disability. 38 C.F.R. §§ 4.1, 4.15.

Because the schedular rating criteria are adequate to rate the Veteran's service-connected bilateral hearing loss, there is no exceptional or unusual disability picture to render impractical the application of the regular schedular standards. For these reasons, the Board finds that the criteria for referral for extraschedular rating have not been met. See Floyd v. Brown, 9 Vet. App. 88, 96 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995); and VAOPGCPREC 6-96 (August 16, 1996).

The Board has considered the provisions of 38 U.S.C.A. § 5107(b) and 38 C.F.R. § 4.3, but there is not such a state of approximate balance of the positive evidence with the negative evidence to otherwise warrant a favorable decision.

PTSD

The Veteran's service-connected PTSD was rated as 50-percent disabling prior to April 8, 2011, and has been rated as 70-percent disabling since under the provisions of 38 C.F.R. § 4.130, DC 9411.

The schedular criteria, effective as of November 7, 1996, incorporate the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM). 38 C.F.R. §§ 4.125, 4.130, DC 9411. Currently, the DSM-V is used in American professional circles, but this claim for increase was filed well before the DSM-V was released. Thus, where advantageous, the Board will consider as well the immediately prior version of the manual - DSM-IV.

A 10 percent rating is warranted for PTSD if there is occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. 38 C.F.R. § 4.130, DC 9411.


A 30 percent rating is warranted for PTSD if there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, or mild memory loss (such as forgetting names, directions, recent events). Id. 

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more 
than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to compete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. Id.

A higher 70 percent rating requires occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals that interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id.

These criteria for a 70 percent rating are met if there are deficiencies in most of the areas of work, school, family relations, judgment, thinking, and mood. Bowling v. Principi, 15 Vet. App. 1, 11-14 (2001).


The highest possible schedular rating of 100 percent requires total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 38 C.F.R. 4.130, DC 9411.

In assessing the evidence of record, the Global Assessment of Functioning (GAF) scores have been considered. The GAF score is a scaled rating reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed. (DSM-IV) at 32).

A GAF score of 39 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up other children, is defiant at home, and 
is failing at school)." Id. 

A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, 
occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. 

A GAF score of 51-60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning, (e.g., few friends, conflicts with peers 
or co-workers)." Id. 


GAF scores that are between 61 and 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. Id. 

As evidenced by use of the phrase "such symptoms as", the list of symptoms in the rating criteria is meant to be mere examples of symptoms that would warrant a particular evaluation, so is not meant to be exhaustive, and the Board need not find all or even some of the symptoms to award a specific evaluation. If the evidence shows the Veteran suffers symptoms or effects that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the diagnostic code, the appropriate equivalent rating will be assigned. Mauerhan v. Principi, 16 Vet. App. 436, 442-3 (2002). The Federal Circuit Court has embraced the Mauerhan Court's interpretation of the criteria for rating psychiatric disabilities. Sellers v. Principi, 372 F.3d 1318, 1326 (Fed. Cir. 2004). Although the Veteran's symptomatology is the primary consideration, the Veteran's level of impairment must be in "most areas" applicable to the relevant percentage rating criteria. Vazquez-Claudio v. Shinseki, 2012-7114 (Fed. Cir. Apr. 8, 2013).

In an April 2011 statement, the Veteran's VA psychiatrist wrote that she had been treating the Veteran since May 2004 and that his condition had deteriorated over time. His symptoms included persistent recurrent nightmares about Vietnam, sleep problems, intrusive thoughts, hypervigilance, temper problems, poor concentration, poor short-term memory, episodic depression, anxiety, and social isolation. She assessed his GAF as a 45 for over the previous 12 months, which, according to the DSM, is indication there is "serious" social and occupational impairment. As well, she noted that she had not seen any improvement in the Veteran's symptoms "over the last couple of years." She related that his interactions with the public were minimal because he could not handle the associated pressure. She added that he could not sustain concentration for any length of time, that he would not be able to function in a work setting, and that she considered him unemployable (hence, the granting of the TDIU).

The Veteran was assigned the higher 70 percent rating for his PTSD and TDIU effectively as of April 8, 2011, the date of that VA staff psychiatrist's letter. Because, however, she indicated the Veteran's symptoms had been the same for the "last couple of years," the Board concludes that the 70 percent rating should be extended back to at least April 8, 2009. See Chotta v. Peake, 22 Vet. App. 80, 
84-86 (2008) (discussing how a retrospective opinion may provide probative comment on the severity of a disability years earlier). That said, the phrase "last couple of years" is vague and inexact. The Board finds that it is the functional equivalent of "more or less." Thus, because the Veteran filed his claim for increase in August 2008, which is not - relatively speaking - that long before April 8, 2009, the Board finds that the date of claim falls within the "last couple of years" umbrella or purview. As such, the higher 70 percent rating for the PTSD is warranted since the August 2008 filing of this claim for a higher rating for this disability. 38 U.S.C.A. § 5110(b)(2); 38 C.F.R. § 3.400(o)(2) ; see also Harper v. Brown, 10 Vet. App. 125 (1997); Quarles v. Derwinski, 3 Vet. App. 129, 134-135 (1992); VAOPGCPREC 12-98, 63 Fed. Reg. 56704 (1998). See, too, Gaston v. Shinseki, 605 F.3d 979 (Fed. Cir. May 20, 2010).

The remaining question is whether an even higher 100 percent rating is warranted at any time, but the Board finds that it is not. As explained, a 100 percent rating for PTSD requires total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. The mere fact that the Veteran has been granted a TDIU owing to the severity of his service-connected disabilities, so including his PTSD, is itself concession there is total occupational impairment. But a close review of the record reveals that his PTSD symptoms, alone, are not like or similar to those encompassed in the rating criteria for a 100 percent evaluation. Id.; Mauerhan, supra.


First in this regard, the Board notes that his GAF score has never fallen below 45. To reiterate, a GAF score of 45 is indicative of "serious" symptoms, but so, too, is a 70 percent schedular rating for PTSD. Moreover, most of the time his GAF score has been higher, about 55, indicative of only moderate symptoms in comparison. Objective findings over the years indicated that he was fully oriented (to time, person, place and situation), that his thought processes were organized, that he denied suicidal and homicidal ideation, that he had no delusions or hallucinations, and that his judgment and insight were intact. He was afforded several VA PTSD examinations. No examiner indicated the Veteran was unemployable due exclusively to his PTSD, although his VA treating psychiatrist felt differently. Again, though, that would only address the occupational impairment component of his disability, not also the social impairment component, and he must be totally disabled in both respects to warrant assigning the highest possible schedular rating of 100 percent. To the contrary, the VA examination reports and other medical evidence of record reveal that he lives with his wife of 45 years and socializes at a bar that he frequents. Otherwise, he watches television and naps. He is irritable with his grandchildren due to noise issues, but there is nothing in the record suggesting he cannot function independently, that he is in persistent danger of harming himself or others, that he cannot recall basic information such as his own name, that he is out of touch with reality, that he is disoriented, or that he cannot communicate or behave appropriately. Thus, the symptoms commonly associated with a 100 percent evaluation for PTSD or similar symptoms are missing. Indeed, none of the three VA examiners who reviewed the file and interviewed him in March 2009, January 2012, and April 2014 concluded there was total social and occupational impairment. As such, the criteria for a 100 percent evaluation for the PTSD have not been met at any time during the appeal period. 38 C.F.R. § 4.130, DC 9411; Mauerhan, supra; Hart, supra.


The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extra-schedular basis. With respect to the first prong of Thun, however, the evidence in this case does not show such an exceptional disability picture that the available schedular evaluation for this service-connected condition is inadequate. A comparison between the level of severity and symptomatology of the Veteran's PTSD with the established criteria found in the Rating Schedule for acquired psychiatric disorders shows that the rating criteria reasonably describe his disability level and symptomatology. His symptoms and areas of impairment are either explicitly part of the schedular rating criteria or are "like or similar to" those symptoms and impairment explicitly listed in the schedular rating criteria or contemplated. Mauerhan, 16 Vet. App. at 443. The levels of occupational and social impairment are also explicitly part of the schedular rating criteria. 
Vazquez-Claudio, supra. In addition, the GAF scores are incorporated as part of the schedular rating criteria, as they tend to show the overall severity of symptomatology or overall degree of impairment in occupational and social functioning. 

The Board further observes that, even if the available schedular evaluation for the disability is inadequate (which it manifestly is not), the Veteran does not exhibit other related factors such as those provided by the regulation as "governing norms." So he does not satisfy the second prong of the Thun analysis, either, therefore irrespective of the first prong. See Johnson v. Shinseki, 26 Vet. App. 237, 247 (2013) (en banc). The record does not show that he has required frequent hospitalizations for his PTSD. Indeed, it does not appear from the record that he has been hospitalized at all for this disability, certainly not on what could be considered a frequent or recurrent basis. Additionally, there is not shown to be evidence of marked interference with his employment because of this disability, meaning above and beyond that contemplated by the schedular rating assigned for this disability (not higher at 70 percent from an earlier effective date). 38 C.F.R. § 4.1. There is nothing in the record suggesting that his PTSD markedly interfered with his ability to perform his job in a satisfactory manner before retiring in 2006. Moreover, there is no evidence in the medical records of an exceptional or unusual clinical picture.

In short, there is nothing in the record indicating this service-connected disability causes impairment in employment or social functioning over and above that which is contemplated in the assigned schedular rating. See Van Hoose, 4 Vet. App. at 363 (noting that the disability rating, itself, is recognition that industrial capabilities are impaired). The Board therefore has determined that referral of this case for extra-schedular consideration pursuant to 38 C.F.R. 3.321(b)(1) is not warranted.

At no time prior has the Veteran evidenced impairment allowing for assignment of an even higher 100 percent rating. Hart, supra.

In making these determinations, the Board has considered the provisions of 38 U.S.C.A. § 5107(b) and 38 C.F.R. § 4.3, but there is not such a state of approximate balance of the positive evidence with the negative evidence to otherwise warrant an even more favorable decision.


ORDER

A compensable rating for the service-connected bilateral hearing loss is denied.

But the higher 70 percent for the PTSD is granted as of an earlier effective date (namely, as of receipt of the August 2008 claim rather than just as of April 8, 2011), subject to the statutes and regulations governing the payment of VA compensation.

An even higher 100 percent rating for the PTSD, however, is denied.



REMAND

The Veteran additionally has hypertension, and he argues that it is due to his service-connected PTSD. There is adequate medical evidence of record indicating the PTSD did not cause the hypertension. But there is not also the required evidence adequately addressing the question of direct service connection or whether alternatively the Veteran's service-connected PTSD and/or other service-connected disabilities, notably, his diabetes mellitus and coronary artery disease, are aggravating his hypertension. So clarification of this is needed.

Accordingly, this claim is REMANDED for the following additional development and consideration:

1. Schedule another VA medical examination for additional medical nexus comment concerning the etiology of the Veteran's hypertension. Specifically, the examiner should comment on the likelihood (very likely, as likely as not, or unlikely) that the Veteran's hypertension is directly or presumptively related to his service - meaning incepted during his service in the United States Army from February 1959 to January 1965 and in the United States Air Force from May 1966 to May 1970 or to a compensable degree within a year of his discharge. Concerning this, the Board sees that his STRs contain some elevated or marginal blood pressure readings - including of 140/70 in January 1965.

But even in the event the Veteran's hypertension is not found to be directly or presumptively related to his service, the examiner must additionally indicate the likelihood (very likely, as likely as not, or unlikely) that the Veteran's hypertension, even if not caused by, alternatively is being aggravated by his service-connected PTSD, diabetes mellitus, and/or coronary artery disease. Evidence of a baseline disability is necessary to establish entitlement to service connection for aggravation of a nonservice-connected condition by a service-connected condition (regulatory change effective from September 2006). An opinion that something "is not related to" or "is not due to" does not answer the question of aggravation. Allen v. Brown, 7 Vet. App. 439, 448 (1995); 38 C.F.R. § 3.310(b) (2014).

Note: the term "as likely as not" means at least 50-percent probability. It does not however mean merely within the realm of medical possibility, rather, that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation or aggravation as it is to find against it.

*To reiterate, to date there only has been medical comment on whether the service-connected PTSD caused the hypertension. The prior VA compensation examiner concluded it did not, but there additionally needs to be comment, as well, on direct and presumptive service connection and additional comment on secondary service connection in terms of whether the service-connected PTSD and other service-connected disabilities (diabetes mellitus, and/or coronary artery disease) alternatively are aggravating the hypertension, meaning chronically (permanently) worsening it beyond its normal or natural progression.


Explanatory rationale for all opinions must be provided since this is where most of the probative value of an opinion is derived, not just from review of the claims file or the conclusion ultimately reached. See, e.g., 
Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). The examination report nonetheless must indicate whether pertinent records in the claims file were reviewed in conjunction with the examination and opinion, including a copy of this decision and remand. In the event that an opinion cannot be rendered without resorting to mere speculation, the examiner must discuss why it would be speculative to respond, so merely saying he/she cannot respond will not suffice.

2. Upon completion of this and all other necessary development, readjudicate this remaining claim for service connection for hypertension in light of this and all other additional evidence. If this claim continues to be denied, send the Veteran and his representative another supplemental statement of the case (SSOC) and give them time to submit additional evidence and/or argument in response before returning the file to the Board for further appellate consideration of this remaining claim.

The Veteran has the right to submit additional evidence and argument concerning this claim the Board is remanding. Kutscherousky v. West, 12 Vet. App. 369 (1999).


This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the Court for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
KEITH W. ALLEN
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs