﻿Citation Nr: AXXXXXXXX
Decision Date: 01/17/19 Archive Date: 01/16/19

DOCKET NO. 180712-290
DATE: January 17, 2019

ORDER

Entitlement to an initial compensable rating from March 18, 2015 to February 8, 2018 for service-connected bilateral hearing loss is denied. 

Entitlement to a higher initial rating from March 18, 2014 to February 8, 2018 for service-connected coronary artery disease (CAD) is denied.

REMANDED

Entitlement to an increased rating for a service-connected left elbow condition from March 18, 2015 to February 8, 2018 is remanded.

Entitlement to service connection for left upper extremity nerve damage, to include as secondary to a service-connected left elbow condition is remanded.

FINDINGS OF FACT

1. Per audiological evaluations, the Veteran’s bilateral hearing loss has manifested with no worse than Level II hearing impairment in each ear during the appeal period.

2. The Veteran’s CAD manifests with, at worst, a workload of greater than 5 but not greater than 7 METs with fatigue and dyspnea, and left ventricular ejection fraction of greater than 50 percent.

CONCLUSIONS OF LAW

1. The criteria for an initial compensable rating for bilateral hearing loss have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1-4.16, 4.85, Diagnostic Code (DC) 6100.

2. The criteria for an initial rating in excess of 30 percent for CAD have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1-4.16, 4.100, 4.104, DC 7005.

REASONS AND BASES FOR FINDING AND CONCLUSION

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Veteran chose to participate in VA’s test program RAMP, the Rapid Appeals Modernization Program. This decision has been written consistent with the new AMA framework.

The Veteran served on active duty in the U.S. Marine Corps from March 1967 to September 1970. The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form. Accordingly, the June 2018 RAMP rating decision considered the evidence of record as of the date VA received the RAMP election form. The Veteran timely appealed this RAMP rating decision to the Board and requested the evidence lane.

1. Entitlement to an initial compensable rating from March 18, 2015 to February 8, 2018 for service-connected bilateral hearing loss.

The Veteran seeks an initial compensable rating for his bilateral hearing loss. Under the AMA, the relevant appeal period is the date of the Veteran’s claim, March 18, 2015, to the date of RAMP opt-in, February 8, 2018. For the reasons that follow, the Board finds that a compensable rating is not warranted.

Hearing loss ratings range from noncompensable to 100 percent based on organic impairment of hearing acuity, as measured by controlled speech discrimination tests in conjunction with average hearing thresholds determined by puretone audiometric testing at frequencies of 1000, 2000, 3000 and 4000 cycles per second. “Puretone threshold average” is the average of the puretone thresholds at 1000, 2000, 3000 and 4000 Hertz. This average is used in all cases (including those in §4.86) to determine the Roman numeral designation for hearing impairment from TABLE VI or VIA. 38 C.F.R. § 4.85, DC 6100.

The rating schedule establishes eleven auditory acuity levels, designated from level I for essentially normal hearing acuity, through level XI for profound deafness. The horizontal rows in TABLE VI represent nine categories of the percentage of discrimination based on the controlled speech discrimination test. The vertical columns in TABLE VI represent nine categories of decibel loss based on the puretone audiometry test. The Roman numeral designation is located at the point where the percentage of speech discrimination and puretone threshold average intersect. Id.

Under certain exceptional patterns of hearing impairment, auditory acuity levels may be calculated using either TABLE VI, as described above, or TABLE VIA, which derives a Roman numeral designation based solely on the puretone audiometry test. 38 C.F.R. § 4.86. The TABLE that produces the higher Roman numeral will be used. Id. These auditory acuity levels are entered into TABLE VII of the rating schedule to determine the percentage disability rating. 38 C.F.R. § 4.85.

The Veteran underwent a VA audiological examination in June 2015. He reported difficulty in hearing if it were not loud enough or if there was noise. On examination, puretone thresholds (in decibels) and speech discrimination scores were as follows: 

 HERTZ 

 1000 2000 3000 4000 Average

RIGHT 35 50 50 55 48

LEFT 30 50 50 60 48

As shown in the table, objective testing produced a puretone threshold average of 48 decibels in both ears. Maryland CNC speech discrimination scores were recorded as 86 percent in the right ear and 90 percent in the left ear. Applying these results to TABLE VI yields a numeric designation of Level II hearing impairment in each ear. Entering Level II hearing impairment for the right and left ears into TABLE VII yields a noncompensable or 0 percent rating. 38 C.F.R. § 4.85, DC 6100.

Based on the audiological evaluation of record, the Veteran’s bilateral hearing loss did not approximate the criteria more nearly corresponding to a compensable rating. The Board does not discount that the Veteran’s assertions; however, schedular disability ratings for hearing loss are based on the results of the audiological studies of record. Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992). Moreover, the rating criteria for hearing loss contemplate the functional effects of decreased hearing and difficulty understanding speech in an everyday work environment as these are the effects that VA’s audiometric tests are designed to measure. Doucette v. Shulkin, 28 Vet. App. 377 (2017). The Veteran’s hearing loss did not produce any other functional effects not contemplated by the rating schedule. Accordingly, a higher initial rating for bilateral hearing loss is not warranted. There are no additional issues expressly or reasonably raised on the record related to this claim.

 

2. Entitlement to a higher initial rating for service-connected coronary artery disease.

The Veteran’s coronary artery disease is currently rated as 30 percent disabling from March 18, 2014, pursuant to 38 C.F.R. § 4.104, Diagnostic Code (DC) 7005. The Veteran generally contends that his condition warrants a higher rating. For the reasons that follow, the Board finds that a higher rating is not warranted.

A 30 percent rating is warranted for CAD with a workload of greater than 5 METs but not greater than 7 METs resulting in dyspnea, fatigue, angina, dizziness, or syncope, or; evidence of cardiac hypertrophy or dilation or electrocardiogram, echocardiogram, or X-ray.

A 60 percent rating is warranted for more than one episode of acute congestive heart failure in the past year, or; workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

Private records from UPMC that were submitted in April 2015 show a diagnosis of acute myocardial infarction in October 2009; an echocardiogram showed ventricular hypertrophy and a LVEF of 52 percent.

In July 2015, the Veteran underwent a VA examination. The examiner noted that he had undergone a cardiac catherization in 2009. At the examination, the Veteran reported chronic fatigue and occasional shortness of breath without specific activity. The examiner found no evidence of congestive heart failure or arrhythmia. An echocardiogram showed evidence of cardiac hypertrophy and a left ventricular ejection fraction of 52 percent. Regarding objective testing, the examiner indicated that exercise-based METs testing was medically contraindicated as the Veteran was morbidly obese and unable to perform treadmill testing. Interview-based testing estimated a workload of greater than 3 but not greater than 5 METs. This METs level reflected the lowest activity level at which the Veteran would report dyspnea and fatigue. The examiner indicated, however, that this METs level was not solely due to the heart condition; it was estimated that the METs level limitation due solely to the service-connected heart condition was greater than 5-7 METs. This METs level has been found to be consistent with activities such as walking 1 flight of stairs, golfing (without cart), mowing lawn (push mower), heavy yard work (digging). The examiner stated that the Veteran’s co-morbid conditions, which include morbid obesity and rheumatoid arthritis, are the cause of his lower METs (of 3-5) and limitations on activities, and that the LVEF is a more accurate indicator of his cardiac function than the estimated METs.

Based on the evidence of record, the Veteran’s CAD approximates the criteria corresponding to a 30 percent rating. The disability manifested in symptoms of fatigue and dyspnea on exertion, and cardiac hypertrophy shown echocardiogram. Exercise-based stress testing was medically contraindicated at the VA examination, so interview-based testing was performed. Those results showed METs, based solely on the heart condition, to be limited to, at worst, greater than 5 but not greater than 7 METs with symptoms of dyspnea and fatigue. Throughout the claim period, left ventricular ejection fraction was above 50 percent. Given these findings, a 30 percent rating is appropriate. 38 C.F.R. § 4.104, DC 7005. The Veteran’s CAD has not approximated the criteria for a higher 60 percent rating based on congestive heart failure, METs level limitation, or left ventricular ejection fraction percentages. Accordingly, a higher 60 percent rating is not warranted. 38 C.F.R. § 4.104, DC 7005. There are no additional issues expressly or reasonably raised on the record related to this claim.

REASONS FOR REMAND

1. Entitlement to an increased rating for a service-connected left elbow condition from March 18, 2015 to February 8, 2018 is remanded.

A remand for a new VA examination to address the Correia and Sharp standards is required. 38 C.F.R. § 4.2. The Veteran’s left elbow condition was examined during a VA examination in May 2015. During that examination, the Veteran reported flare-ups, but the examiner did not provide an opinion regarding any additional limitation of motion due to functional loss during flares. Sharp v. Shulkin, 29 Vet. App. 26 (2017).

Further, in Correia v. McDonald, 28 Vet. App. 158 (2016), the United States Court of Appeals for Veterans Claims (Court) held that to be adequate, a VA examination of the joints must, wherever possible, include the results of the range of motion testing described in the final sentence of 38 C.F.R. § 4.59. Thirty-eight C.F.R. § 4.59 states that “[t]he joints involved should be tested for pain on both active and passive motion, in weight-bearing and nonweight-bearing and, if possible, with the range of the opposite undamaged joint.” As such, pursuant to Correia, an adequate VA joints examination must, wherever possible, include range of motion testing on active and passive motion and in weight-bearing and nonweight-bearing conditions, and if possible, range of motion testing for the opposite undamaged joint. The examination of record does not include such testing.

For these reasons, a new examination and opinion is required.

2. Entitlement to service connection for left upper extremity nerve damage, to include as secondary to a service-connected left elbow condition is remanded.

The Veteran contends that his current nerve damage is secondary to his service-connected left elbow condition. The Veteran underwent a VA examination in May 2015. At that time, the examiner noted that the Veteran had nerve damage to the wrist ulnar nerve, but that it was less likely than not proximately due to or the result of the Veteran’s service-connected left elbow condition. While the examiner addressed causation, she did not address whether or not the Veteran’s service-connected left elbow condition aggravated his current nerve condition. As such, an addendum opinion is required.

Furthermore, a review of the Veteran’s service treatment records show that he was diagnosed with left radial nerve palsy in service. See December 1967 Service Treatment Record. On remand, the examiner should also address whether the Veteran’s current nerve condition is directly related the in-service left radial nerve palsy.

The matters are REMANDED for the following action:

1. Schedule the Veteran for an examination to determine the severity of his service-connected left elbow condition. The examiner must test the Veteran’s active motion, passive motion, and pain with weight-bearing and without weight-bearing. If for any reason the examiner is unable to conduct the required testing or concludes that the required testing is not necessary, or is not medically appropriate, in this case; he or she should clearly explain why that is so.

The examiner should also express an opinion as to whether pain, weakness, fatigability, or incoordination cause additional functional impairment on repeated use over time or during flare-ups. The examiner should assess the additional functional impairment in terms of the degree of additional range-of-motion loss, if possible. If the Veteran is not being observed after repetitive use or during a flare-up, the examiner must still estimate any additional functional loss during flare-ups or on repeated use, based on the Veteran’s description of his flares’ severity, frequency, duration, and/or functional loss manifestations.

2. Return the claims file to the May 2015 VA examiner, or another appropriate clinician if that examiner is unavailable, for an addendum medical opinion as to whether it is at least as likely as not that the Veteran’s current nerve condition has been aggravated by his service-connected left elbow condition. The claims file and a copy of this Remand must be made available to the reviewing examiner. The need for another examination is left to the discretion of the examiner.

The term “aggravation” means a chronic worsening of a disability beyond its natural progression. If aggravation is found, then, to the extent possible, the examiner should establish a baseline level of severity of the nerve condition prior to aggravation by the service-connected left elbow disability.

The examiner must also opine whether it is at least as likely as not (a 50 percent or greater probability) that the Veteran’s current nerve condition had its onset in, or is otherwise related to, active service, to include the in-service diagnosis of left radial nerve palsy.

A complete rationale must be provided for all opinions expressed. 

 

D. JOHNSON

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD E. Mortimer, Associate Counsel